Duane CORLEY, et al., Plaintiffs,

v.

ENTERGY CORPORATION,
et al., Defendants.

Douglas C. Dishman, et al., Plaintiffs,

v.

Entergy Corporation, et
al., Defendants.

Civil Action Nos. 1:98CV2006,
1:98CV2054.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 24, 2003.

Richard Lyle Coffman, Raymond Lyn Stevens, of Stevens, Baldo, Freeman, LLP, Beaumont, TX, for Plaintiffs.

Lawrence Louis Germer, Lawrence James, Simmons, Jr., David Lawrence

Merkley of Germer, Bernsen & Gertz, Beaumont, TX, for Defendants, Entergy Technology Holding Co.

Lawrence Louis Germer, Lawrence James, Simmons, Jr, David Lawrence Merkly of Germer, Bernsen & Gertz, Paul Anthony Scheurich, Entergy Services, Inc., Beaumont, TX, for all other defendants.

## MEMORANDUM OPINION AND ORDER PARTIALLY ADOPTING REPORT & RECOMMENDATION OF MAGISTRATE JUDGE

SCHELL, District Judge.

Before the court is the *Report & Recommendation on Cross Motions for Summary Judgment* [Clerk's Docket No. 186]. Having considered *Defendants' Motion for Summary Judgment on Construction of Easements* [Clerk's Docket No. 105], *Representative Plaintiffs' Motion for Summary Judgment on Construction of Easements and Response to the Defendants' Motion for Summary Judgment on Construction of Easements* [Clerk's Docket No. 113], *Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment* [Clerk's Docket No. 121], *Plaintiffs' Supplemental Evidence in Support of Their Motion for Summary Judgment and Surreply to the Defendants' Motion for Summary Judgment* [Clerk's Docket No. 166], *Defendants' Reply to Representative Plaintiffs' Supplemental Evidence in Support of Their Motion for Summary Judgment and Surreply to the Defendants' Motion for Summary Judgment* [Clerk's

Docket No. 171], *Defendants' Objections to Magistrate's Report & Recommendation on Cross Motions for Summary Judgment* [Clerk's Docket No. 187], *Representative Plaintiffs' Response to the Defendants' Objections to Magistrate's Report & Recommendation on Cross–Motions for Summary Judgment* [Clerk's Docket No. 188], *Defendants' Supplemental Post–Hearing Brief in Support of Defendants' Motion for Summary Judgment* [Clerk's Docket No. 192], *Representative Plaintiffs' Post–Hearing Brief and Response to the Defendants' Post–Hearing Brief* [Clerk's Docket No. 193] and *Defendants' Response to Representative Plaintiffs' Post–Hearing Brief* [Clerk's Docket No. 197], and following hearing thereon, the court enters this memorandum opinion and order.

## I. FACTUAL & PROCEDURAL BACKGROUND

This litigation involves the interpretation of four easements. Following assignment to this court's docket, all pre-trial matters were referred to the magistrate judge for disposition or recommendation. 28 U.S.C. § 636(b)(1)(A),(B); FED.R.CIV.P. 72; LOCAL COURT RULES (Appendix B). On March 27, 2001, the magistrate judge entered a *Report & Recommendation on Cross Motions for Summary Judgment* [Clerk's Docket No. 186]. This court heard argument on defendant's objections to the recommendation and accepted for consideration post-hearing briefs from both sides.

### A. The Parties

On November 25, 1998, Duane T. Corley filed a putative class action lawsuit[1]

---

**1.** An amended complaint [Clerk's Docket No. 3] filed December 18, 1998 added Carl E. Shrontz and William A. Roane as additional representative class plaintiffs to the Corley case. Also on December 18, 1998, Douglas C. Dishman and Tim E. Dishman (the Dishman

plaintiffs) filed a class action complaint factually and procedurally identical to the Corley case. Although the Dishman case was originally assigned to the docket of Judge Joe J. Fisher, it was reassigned and consolidated with the Corley case on February 3, 1999. As

against Entergy Corporation and several of its subsidiaries. Plaintiffs have rights to real property in Jefferson, Montgomery and Hardin counties. *Defs.' Mot. for Summ. J., Exs. A, B, C, D and E* [Clerk's Docket No. 105]. Between 1930 and 1969, plaintiffs' predecessors in interest granted certain easements to Gulf States Utilities Company (GSU) in connection with the extension of its electrical power infrastructure. *Id.* On December 31, 1993, GSU merged with Entergy Corporation and became a wholly owned subsidiary thereof. On April 22, 1996, GSU filed amended articles of incorporation legally changing its name to Entergy Gulf States, Inc. As such, the easements at issue are now held by Entergy Gulf States, Inc.

Plaintiffs brought suit against Entergy Corporation, Entergy Gulf States, Inc., Entergy Arkansas, Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., Entergy Services, Inc., Entergy Technology Holding Company and Entergy Technology Company. For purposes of clarification, the court briefly considers the character and interrelationships of these corporations.

Entergy Corporation is a registered public utility holding company. *Defs.' Mot. for Summ. J.,* ¶ 1 [Clerk's Docket No. 105]. As such, Entergy is subject to the PUBLIC UTILITY HOLDING COMPANIES ACT (PUHCA), codified at 15 U.S.C. § 79 et seq., which regulates the operation and activities of public utility holding companies.

Entergy Gulf States, Entergy Arkansas, Entergy Louisiana and Entergy Mississippi are wholly owned domestic retail electric subsidiaries of Entergy Corporation. *Defs.' Mot. for Summ. J.,* ¶ 2 [Clerk's Docket No. 105]. "Much of the utility industry consists of holding compa-

ny arrangements in which the utility operating company is the subsidiary of a parent corporation." *See Gen. Tel. Co. of the Southwest v. Pub. Util. Comm'n of Texas,* 628 S.W.2d 832, 837 (Tex.App.-Austin 1982, writ ref'd n.r.e.). It is the operating companies which own the power line infrastructure, generating stations, administrative offices, control centers, and of particular importance to this case, the easements across private property on which the power lines are located. These utility operating companies are subject to regulatory control by the states in which they operate.

As an electric utility operating in the State of Texas, Entergy Gulf States is subject to the PUBLIC UTILITY REGULATORY ACT (PURA), codified at TEX. UTIL.CODE § 11.001 et seq. The Public Utilities Commission (PUC) has exclusive jurisdiction over the rates, operations and services provided by electric utilities operating in the State of Texas. *Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 216 (Tex.2002); TEX. UTIL.CODE §§ 32.001(a), 36.001. PURA confers on the PUC the power to ensure that rates charged by electrical utilities operating in this state are "just and reasonable." TEX. UTIL.CODE § 36.003. In making this determination, the PUC considers transactions with affiliates of the regulated entity.

Entergy Services, Inc. is a wholly owned subsidiary of Entergy Corporation. *Defs.' Mot. for Summ. J.,* ¶ 1 [Clerk's Docket No. 105]. Incorporated in the State of Delaware, Entergy Services provides general executive, advisory, administrative, accounting, legal, engineering, and other services primarily to the domestic utility subsidiaries of Entergy Corporation.

Entergy Technology Holding Company (ETHC) is a non-regulated, wholly owned

the first-filed case, the Corley case was designated the lead case.

subsidiary of Entergy Corporation. *Defs.' Mot. for Summ. J.*, ¶ 1 [Clerk's Docket No. 105]. ETHC was incorporated February 26, 1996 in the State of Delaware. ETHC's stated purpose for transacting business in Texas is as a stock holding company. During 1996, Entergy through ETHC first entered into several non-regulated telecommunication ventures. By 1997, ETHC was engaged in a variety of telecommunication and information-based enterprises that are exempt from regulation under PUHCA and PURA. According to Entergy Corporation's 1997 public filings:

> ETHC has acquired security monitoring firms operating primarily in North and South Carolina, Alabama, Florida, Georgia, Mississippi, Louisiana, and Texas. ETHC participates with Hyperion Telecommunications in a joint venture that operates three Competitive Local Exchange Carriers (CLECs) in Little Rock, Arkansas; Jackson, Mississippi; and Baton Rouge, Louisiana. These CLECs provide long distance carrier access and local exchange services. *ETHC also currently operates 1,500 miles of fiber optic cable in Arkansas, Louisiana, Mississippi, and Texas that provide long haul telecommunications to wholesale telecommunication carriers.* ETHC has made a limited investment in a personal communication services company which will be located in the southeastern United States.

> \* \* \*

> *Entergy has begun to commercialize the fiber optic telecommunications network that connects its facilities and supports its internal business needs. Entergy provides long haul fiber optic capacity to major telecommunications carriers, which in turn, market that service to third parties.* The Telecommunications Act of 1996 permits a company such as Entergy to market such a service, subject to state and local regulatory approval. . . . [T]he law requires that such telecommunications subsidiaries file for exemption from regulation with the Federal Communications Commission, and *that they not engage in transactions with utility affiliates within their holding company systems or acquire utility affiliates' rate-based property without state or local regulatory approval.*

Entergy Technology Company (ETC) is a non-regulated, wholly owned subsidiary of Entergy Technology Holding Company. *Defs.' Mot. for Summ. J.*, ¶ 1 [Clerk's Docket No. 105]. Like ETHC, ETC was also incorporated on February 12, 1996 in the State of Delaware. It is ETC that actually markets the excess fiber optic capacity to third parties; enters into contracts with third party long distance carriers conveying leasehold rights to use Entergy Gulf States' easements across the plaintiffs' property; and to some extent, operates and maintains the fiber optic network. *Defs.' Mot. for Summ. J.*, ¶ 5 [Clerk's Docket No. 105]; *see also Rep. Pls.' Resp. to Def.'s Objections* at 2, n. 2 [Clerk's Docket No. 188]. It is also ETC that accepts payment from long distance carriers for the right to use Entergy Gulf States' easements across plaintiffs' property. ETC then pays Entergy Gulf States a fee, which is apparently some amount less than the leasehold price. *Defs.' Mot. Summ. J.*, ¶¶ 5, 14 [Clerk's Docket No. 105]. In spite of the importance of the relationship between ETC and Entergy Gulf States, there is no evidence before the court of a contract which defines their relative rights and obligations with respect to use of the easements. Moreover, the court is unclear as to whether the PUC considers the income generated by the leases or simply the

fees ETC pays Entergy Gulf State in setting its electrical rates in Texas. TEX. UTIL.CODE § 36.057; *see also Gen. Tel. Co. of the Southwest v. Pub. Util. Comm'n of Texas*, 628 S.W.2d 832, 837 (Tex.App.-Austin 1982, writ ref'd n.r.e.)("Any transaction relating to services to the affiliate or sale, lease, or other transfer of property, rights, or things are to be reviewed.").

It is worth noting that ETC and ETHC filed certificates to transact business in the State of Texas just four days after the effective date of the TELECOMMUNICATIONS ACT OF 1996 (Telecomm Act), Public L. No. 104–104 § 652 (1996). The Telecomm Act was the first comprehensive revision of the COMMUNICATIONS ACT OF 1934. It changed in meaningful ways the regulations and rules governing competition in regulated industries. Of particular importance to this case, the Telecomm Act eliminated cross-market entry barriers among the telecommunications, cable television, radio and television broadcasting and burglar alarm monitoring industries. As such, it was the Telecomm Act that made it possible for Entergy's subsidiaries to enter the telecommunications field given its status as an electric utility holding company.

## B. *The Easements*

The easements at issue in this lawsuit can be divided into four categories:

### *Type I Easement—Electricity Only*

THE RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON AND TO CONSTRUCT, MAINTAIN, OPERATE, INSPECT, PATROL, REPLACE, REPAIR, AND REMOVE TWO LINES OF STRUCTURES, FOR ONE OR MORE CIRCUITS EACH, COMPOSED OF WOOD, METAL OR OTHER TYPES OF MATERIAL WITH LINES OF WIRES, CROSSARMS, GUY WIRES, STUBS, FOUNDATIONS, ANCHORS AND OTHER USUAL FIXTURES **FOR THE TRANSMISSION OF ELECTRICITY** .... *See Rep. Plfs.' Mot. for*

*Summ. J., Ex. F* [Clerks's Docket No. 113] (emphasis added).

### *Type II Easements—Electricity and Entergy Gulf States' Internal Communications*

THE RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON AND TO ERECT, CONSTRUCT, MAINTAIN, OPERATE, INSPECT, REPLACE, REPAIR, PATROL, AND REMOVE ONE OR MORE LINES OF WOOD OR METAL STRUCTURES ... WITH LINES OF WIRES, CROSSARMS, GUY WIRES, CONDUITS, STUBS AND OTHER USUAL FIXTURES **FOR THE TRANSPORTATION OF ELECTRICITY AND GRANTEES [SIC] COMMUNICATIONS**.... *See Rep. Plfs.' Mot. for Summ. J., Ex. E* [Clerks's Docket No. 113] (emphasis added).

### *Type III Easements—Electricity and Telephone*

THE PERPETUAL RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON, TO ERECT, CONSTRUCT, EXTEND, MAINTAIN, INSPECT, OPERATE, REPLACE, REMOVE, REPAIR AND PATROL ONE OR MORE LINES OF POLES OR TOWERS ... WITH LINES OF WIRES, CROSS-ARMS, GUY WIRES, CONDUITS, STUBS AND OTHER USUAL FIXTURES, APPLIANCES AND APPURTENANCES USED OR ADAPTED **FOR THE TRANSMISSION OF ELECTRICITY, ELECTRIC ENERGY AND POWER FOR ANY AND ALL PURPOSES FOR WHICH ELECTRICITY, ELECTRIC ENERGY, AND POWER IS NOW OR MAY HEREAFTER BE USED, AND FOR TELEPHONE OR TELEGRAPH USE** .... *See Defs.' Mot. for Summ. J., Exs. A & B* [Clerk's Docket No. 105] (emphasis added).

### *Type IV—Electricity and Communications*

THE RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON AND TO CONSTRUCT, MAINTAIN, OPERATE, INSPECT, PATROL, REPLACE, REPAIR, PATROL AND REMOVE ONE OR MORE LINES OF STRUCTURES FOR ONE OR MORE CIRCUITS ... WITH LINES OF WIRES, CROSSARMS, GUY WIRES, STUBS, FOUNDATIONS, ANCHORS AND OTHER

USUAL FIXTURES FOR THE TRANSMISSION OF ELECTRICITY AND COMMUNICATIONS.... *See Defs.' Mot. for Summ. J., Ex. C* [Clerk's Docket No. 105] (emphasis added).

## C. *Technological Background*

Prior to 1994, copper wire was used to transmit both electricity and GSU's internal communications. Although copper wire is still used to transmit electrical power, GSU installed[2] a fiber optic cable[3] for the transmission of communications. Fiber optic cables differ from electric power cables both in function and design. "Power cables are designed for high voltages and high current loads, whereas both voltage and current in a communication cable are small." *See* "Electric Telecommunication Cables," ENCYCLOPEDIA BRITANNICA ONLINE, *available at* http://www.britannica.com. "Power cables operate on direct current or low-frequency alternating current, while communication cables operate at higher frequencies." *Id.* "A power cable usually has not more than three conductors, each of which may be 1 inch (2.5 cm) or more in diameter; a telephone cable may have several thousand conductors, the diameter of each being less than 0.05 inch (0.125 cm)." *Id.*

## D. *The Litigation*

It is undisputed that all easements involved in this litigation contemplate use of the plaintiffs' property for the transmission of electricity. Further, it has been conceded by the plaintiffs that all easements except Type I expressly conveyed to GSU the right to use the plaintiffs' property for the transmission of GSU's internal communications related to the transmission of electricity. The questions before the court are whether any of the four types of easements also allow Entergy Gulf States to use plaintiffs' property to transmit communications between third parties unrelated to its internal communications, and whether Type I easements grant by implication the right to use plaintiffs' property for the transmission of GSU's internal communications related to the transmission of electricity.

## II. LEGAL STANDARD—MOTIONS FOR SUMMARY JUDGMENT

This court makes a *de novo* review of the report and recommendation to the extent objections have been properly raised. 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The purpose of summary judgment proceedings is to dispose of factually and legally unsupported claims and defenses while protecting parties' respective rights to trial on disputed issues. *Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. at 2553. Disposition by summary judgment is not viewed as a "disfavored procedural shortcut, but rather as an integral part of the FEDERAL RULES as a

---

2. Interestingly, the fiber optic cable was installed by helicopter. *See Defs.' Mot. for Summ. J.,* ¶ 4 [Clerk's Docket No. 105]. No notice of the installation of the fiber optic cable was given to the landowners. *See Rep. Pls.' Mot. for Summ. J.* at 7 [Clerk's Docket No. 113].

3. Fiber optic cables are made of specially treated plastic or glass fibers which transmit information in the form of light pulses. *See* "Telecommunications," MICROSOFT® ENCARTA® ONLINE ENCYCLOPEDIA 2000, *available at* http://encarta.msn.com.

whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting FED. R.CIV.P. 1).

As an initial matter, the burden is on the party seeking summary judgment to demonstrate that there is no genuine issue as to any material fact.[4] *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once this initial showing is made, the burden shifts to the non-movant to identify specific facts demonstrating the existence of a genuine issue for trial. FED.R.CIV.P. 56(e). To carry this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, "must come forward with 'specific facts showing that there is. a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting FED. R.CIV.P. 56(e)).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Rather, only disputes over facts that might affect the outcome of the lawsuit under governing law preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). When considering motions for summary judgment, courts must resolve all reasonable doubts in favor of the nonmoving party. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *See Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2505). " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.'" *Id.*

The question whether an easement is ambiguous and the interpretation of an unambiguous easement are questions of law appropriate for consideration on motion for summary judgment. *See Hall v. Lone Star Gas Co.,* 954 S.W.2d 174, 176 (Tex.App.-Austin 1997, pet. denied).

## III. LEGAL BACKGROUND—THE LAW OF EASEMENTS

### A. *Easements Generally*

██ "An easement extends to certain persons the right to use the land of another for a specific purpose." *See Long Island Owner's Ass'n, Inc. v. Davidson,* 965 S.W.2d 674, 684 (Tex.App.-Corpus Christi 1998, pet. denied) (citation omitted); *see also Cecola v. Ruley,* 12 S.W.3d 848, 852 (Tex.App.-Texarkana 2000, no pet.). An easement does not, however, convey title to property. *Id.*

"The right to select the ... purpose of an easement belongs initially to the grantor at the time he conveys the easement...." *See Holmstrom v. Lee,* 26 S.W.3d .526, 533 (Tex.App.-Austin 2000, no pet.) (citations omitted). "Once established, the location or character of the easement cannot be changed without consent of the parties." *Id.*

---

4. For purposes of summary judgment, an issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmovant; a fact is "material" if its resolution under substantive law in favor of one party might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

There are two types of easements: in gross and appurtenant. *See Long Island Owner's Ass'n*, 965 S.W.2d at 684. "An easement appurtenant attaches to the land and passes with it...." *Id.* An easement in gross is personal in nature, and the apportionability thereof under Texas law is subject to debate. Easements in gross were traditionally considered to be non-apportionable. "[T]he more modern view ... is that such an easement is partially alienable where it does not burden the underlying land beyond what was contemplated in the original easement grant." *See Orange County v. Citgo Pipeline Co.*, 934 S.W.2d 472, 475 (Tex.App.-Beaumont 1997, writ denied) (citation omitted).

### B. *Construction of Easements*

■ In construing easements, courts look to rules of contract interpretation. *See Marcus Cable Assoc. v. Krohn*, 90 S.W.3d 697, 700 (Tex.2002); *DeWitt County Electric Co-op. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999). The court's primary purpose is to give effect to the objective intention of the parties as expressed in the instrument. The process of deed construction has been described as a three-step process. *See Terrill v. Tuckness*, 985 S.W.2d 97, 102 (Tex.App.-San Antonio 1998, no pet.).

The court begins its analysis by examining the objective intent of the parties as expressed by the plain language of the writing—the so-called four corners rule—in the light of "attending circumstances." *Bennett v. Tarrant County*, 894 S.W.2d 441, 446–47 (Tex.App.-Fort Worth 1995, writ denied); *Jones v. Fuller*, 856 S.W.2d 597, 603 (Tex.App.-Waco 1993, writ denied); *Suthers v. Booker Hosp. Dist.*, 543 S.W.2d 723, 727 (Tex.App.-Amarillo 1976, writ ref'd n.r.e.); *Kearney & Son v. Fancher*, 401 S.W.2d 897, 903 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.).

In so doing, the granting language "is to be given its plain grammatical meaning." *DeWitt*, 1 S.W.3d at 101; *see also Krohn*, 90 S.W.3d at 701 ("When the grants terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning."). "When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law." *DeWitt*, 1 S.W.3d at 100.

■ If an easement cannot be construed based upon a reading of the four corners of the instrument, the court then applies established rules of construction. An easement must be construed in its entirety, so as to give effect to all provisions contained therein. *See Smart v. Tower Land and Inv. Co.*, 597 S.W.2d 333, 337 (Tex.1980). Courts construe the language against the grantor so as to give the grantee the greatest estate permissible under the instrument. *See MGJ Corp. v. City of Houston*, 544 S.W.2d 171, 174 (Tex.Civ. App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.); *see also Temple–Inland Forest Prods. Corp. v. United States*, 988 F.2d 1418, 1421 (5th Cir.1993). Instruments are construed against the drafter. *See Harris v. Phillips Pipe Line Co.*, 517 S.W.2d 361, 364 (Tex.Civ.App.-Austin 1974, writ ref'd n.r.e.).

■ If the terms are susceptible to more than one meaning after applying established rules of construction, the easement is ambiguous. Whether a term is ambiguous is a question of law for the court to decide. *See Hall v. Lone Star Gas Co.*, 954 S.W.2d 174, 176 (Tex.App.-Austin 1997, writ denied). The Texas Supreme Court revisited the issue of what constitute an ambiguous term in *DeWitt County Electric Co-op., Inc. v. Parks*, 1 S.W.3d at 100:

A term is not ambiguous because of a simple lack of clarity. Nor does an ambiguity arise merely because the parties to an agreement proffer different interpretations of a term. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable.

 Parol evidence is admissible to construe an ambiguous easement. Courts look to the "circumstances surrounding the execution of the deed and other actions from which the grantor's intent may be implied." *Russell v. City of Bryan,* 797 S.W.2d 112, 115 (Tex.App.-Houston [14th Dist.] 1990, writ denied). The plain and ordinary meaning of ambiguous language may be explained by evidence of custom or usage. *Chadwick v. Esperanza Trade & Transport, Ltd.,* 548 F.2d 1161 (5th Cir. 1977).

 The court may construe as a matter of law an ambiguous contract by considering undisputed evidence of the parties' intent. If there is a conflict in the parol evidence, however, the question of the parties' intent becomes one of fact, appropriate for consideration by the jury. *Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 575 (Tex.1968).

C. *Whether these Easements Include Right to Install and Lease Fiber Optics*

In construing an easement, "the primary duty of a court is to ascertain the intent of the parties by a fundamental rule of construction known as the 'four corners' rule." *Bennett,* 894 S.W.2d at 446. "In so doing, the court is not looking for the subjective intent of the parties ... instead, it is the objective intent, the intent expressed or

apparent in the writing that is sought." *Id.*

## IV. DEFENDANTS' OBJECTIONS TO REPORT & RECOMMENDATION

After considering the parties' written submissions and oral arguments, the court is of the opinion that the report and recommendation of the magistrate judge should be modified in the following respects.

A. *Construction of Easements Types I–IV—Transmission of Third Party Communications Not a Right Incidental to Entergy Gulf State's Right to Transmit Electricity*

Defendants contend the magistrate judge erred in finding that the easements may not be used to transmit third party communications as a right incidental to the transmission of electricity. *Defs.' Objections,* ¶¶ 1, 2 [Clerk's Docket No. 187].

As noted by defendants, it is well settled under Texas law that:

> Every easement carries with it the right to do such things as are reasonably necessary for the full enjoyment of the easement, and the extent to which incidental rights may be exercised depends on the object and purpose of the grant and whether such rights are limited by the terms of the grant. However, the exercise of the right must be such as will not injuriously increase the burden on the servient owner, and there may be no use that will interfere with the servient owner's free enjoyment of that part of the property not affected by the easement.
>
> * * *
>
> An easement gives no dominant right over the servient land unnecessary to the enjoyment of the easement.

\* \* \*

The grantor of an easement may limit the grant in any way the grantor chooses, and the grantee takes the easement subject to the restrictions imposed. [W]here easements are created by conveyance, ... the extent of such easements depends on the terms of the grant or reservation, properly construed.

31A Tex. Jur. 3d § 64, pp. 121–123 (1994); *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 208 (Tex.1963); *Exxon Corp. v. Schutzmaier,* 537 S.W.2d 282, 287 (Tex. App.-Beaumont 1976, no writ).

The court is guided by the holding in *Marcus Cable Associates v. Krohn,* 90 S.W.3d 697 (Tex.2002). In *Krohn,* plaintiffs' property was burdened by an easement for "an electric transmission or distribution line or system." *Id.* at 699. Plaintiffs sued a cable company that entered their property and attached television cables to an electric cooperative's poles. *Id.* The defendant cable company moved for summary judgment on two grounds: arguing first that it was legally authorized by Texas Util.Code § 181.02 to' install the television cables to the cooperative's poles, and second, that the electric cooperative partially assigned its right to use plaintiffs' property to the cable company. *Id.*

Regarding the cable company's first theory, the Texas Supreme Court held that "... section 181.102 does not encompass private easements granted to utilities." *Krohn,* 90 S.W.3d at 706–07.

The *Krohn* court also rejected the cable company's second theory advanced in support of its attachment to the electric utility poles, holding that "the easement language here, properly construed, does not permit cable television lines." *Id* at 706. The court observed that the electrical easement was narrowly drawn, limiting it ·to use by one electric transmission system. In so

holding, the court noted that cable television is not ordinarily associated with the transmission of electricity, and as such, the right to string. cable lines is not implicit in an easement granting the right to use land for the transmission of electrical power. The court held that "[n]othing passes by implication except what is reasonably necessary to fairly enjoy the rights expressly granted ... [t]hus, if a particular purpose is not provided for in the grant, a use pursuing that purpose is not allowed." *Id.* at 701 (citations omitted).

With respect to all four types of easements, the court finds that the defendants' use of these easements to transmit third party communications is not a right incidental to the right in the easements to transmit electricity. The purported conveyance by Entergy Gulf States to telephone companies of the right to use these easements to facilitate third party communications is clearly not necessary in order for Entergy Gulf States to fully enjoy the express grant in the easements to transmit electricity.

Defendants cite several Texas cases which, this court has considered in reaching this conclusion, including but not limited to *Knox v. Pioneer Natural Gas Co.,* 321 S.W.2d 596; 601 (Tex.Civ.App.-El Paso 1959, writ ref'd n.r.e.)(although "every easement carries with it the right to do whatever is reasonably necessary for the full enjoyment of the easement itself ... the extent to which such incidental rights may be exercised depends upon the object and purpose of the grant and whether such rights are limited by the terms of the grant creating the easement"); *San Jacinto·Sand Co. v. Southwestern Bell Tel. Co.,* 426 S.W.2d 338, 344–45 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.)("[t]he grantee of an easement is entitled to such rights ·as are incident, essen-

tial or necessary to the enjoyment of such easement" but "an easement [ ] gives no exclusive dominant right over the servient land unnecessary to the enjoyment of such easement, and the dominant owner (easement owner) must make a reasonable use of the right so as not unreasonably to interfere with the property rights of the owner of the servient estate"); *Central Power and Light Co. v. Holloway*, 431 S.W.2d 436 (Tex.Civ.App.-Corpus Christi 1968, no writ)("every easement necessarily carries with it the right to do such things as are reasonably necessary for the full enjoyment of the easement, and the extent of which incidental rights may be exercised depends on the object and purpose of the grants and whether such rights are limited by its terms"); *City Pub. Serv. Bd. of San Antonio v. Karp*, 585 S.W.2d 838, 841 (Tex. Civ.App.-San Antonio 1979, no writ)("an easement granted for general purposes includes not only the use required at the time of the grant, but also the right to use the easement for any purposes connected with the use to which the property is being put"); *Peterson v. Barron*, 401 S.W.2d 680, 686 (Tex.App.-Dallas 1996, no writ)("where the easement is granted for general purposes, it includes not only the use required at the time of the grant, but also the right to use the easement for any purposes connected with the use to which the property is being put"); *Harris v. Phillips Pipe Line Co.*, 517 S.W.2d 361, 364 (Tex.Civ. App.-Austin 1974, writ ref'd n.r.e.)(while "any grant of an easement necessarily carries with it the right to do such things as are reasonably necessary for the full enjoyment of the easement granted .... [t]he extent to which incidental rights may be exercised under the grant must depend upon the object and purpose of the grants and whether such incidental rights are limited under terms of the grant").

Defendants specifically take issue with the failure of the magistrate judge to find *Mellon v. Southern Pacific Transport Co.*, 750 F.Supp. 226 (W.D.Tex.1990) controlling as to the facts of this case. The magistrate judge distinguished *Mellon* on the basis that it involved a railroad right-of-way, recognized by the district court to be a "very substantial thing" constituting something "more than an easement." *Id.* at 230. This court agrees with the magistrate judge that *Mellon* is not determinative of the case at bar.

Based on the foregoing, the court concludes that transmission of third party communications is not a right incidental to Entergy Gulf States' right under the easements to transmit electricity.

Defendants also argue that allowing the easements to be used by third party telecommunications companies does not materially increase the burden on the servient estates. However, "if a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate ... [t]hus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use." *Krohn* at 703. With respect to Type I and Type II easements, the placement of fiber optic lines for use by third parties for telephone communications does not serve the easements' express purpose, which is the transmission or transportation of electricity.

B. *Construction of Type I Easements— Transmission of Entergy Gulf State's Internal Communications a Right Incidental to the Right to Use Easements for the Transmission of Electricity*

██ Defendants object to the magistrate judge's conclusion that Entergy Gulf States may utilize the Type I easements

for the transmission of electricity, but may not install fiber optic lines for the purpose of controlling the flow of that electricity. To the extent the magistrate judge's report and recommendation so holds, the court will sustain the defendants' objection. As an initial observation, the court notes that the Type I easements *expressly* convey the right to install the "usual fixtures" for the transmission of electricity, which would include lines of communication necessary to control the electric current. Moreover, the incidental use doctrine, discussed above, entitles Entergy Gulf States to also utilize the Type I easements for the purpose of constructing, operating and maintaining a system for controlling the flow of the electricity that it has an easement to transmit. This is so because modern electric utilities need an internal system for the transmission of voice, data and circuit relay functions. Such a system enables centralized control of the electric transmission and distribution power grid, generating stations, electric substations, and other related facilities. As such, an internal communications system is necessary for the full enjoyment of the electrical easement. This being so, Entergy Gulf States may install and utilize a fiber optic network for the transmission of its internal communications to the extent those communications are utilized to control the flow of electricity. Because use of the communications network is necessarily limited by the object and purpose of the Type I easements—the transmission of electricity—the network may not be used to transmit third party communications.

C. *Construction of Type II Easements— Easement Language Expressly Limits Use of Easement to Entergy Gulf State's Internal Communications*

The plain language of the Type II easements expressly precludes Entergy Gulf States from using the easements for purposes other than the transmission of electricity and Entergy Gulf States' internal communications. It is well-settled that:

> Where the terms are specific, they are decisive of the limits of the use, so that the use may not be enlarged beyond that warranted by the grant. Nothing passes by implication as incidental to a grant of an easement except what is reasonably necessary to its fair enjoyment.

> \* \* \*

> where the easement . . . is granted for a particular, designated use or purpose[,] . . . the grantee is restricted to such stated purpose, without necessity for specific negation of all other possible uses which could be made of the property.

> \* \* \*

> where the parties to an instrument granting, reserving or covenanting for an easement specifically state the uses or purposes for which it is created, the instrument is, of course, limited to such uses and cannot be enlarged by and change in the use or character of the dominant tenement.

*Kearney & Son v. Fancher,* 401 S.W.2d 897, 903–05 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.).

Therefore, consistent with the terms under which the Type II easements were conveyed, Entergy Gulf States may install a fiber optic network and use it for the transmission of internal communications, including communications needed to control the flow of electricity. However, because the language in these easements limits the use to "grantees [sic] communications", the communication network cannot be used for any purpose other than the

transmission of Entergy Gulf States' internal communications. As such, the Type II easements may not be used for the transmission of third party communications unrelated to Entergy Gulf States' internal communication needs.

D. *Construction of Type III Easements—Easement Language Expressly Grants "Telephone or Telegraph Use"*

■ The plain language of Type III easements expressly permits the defendants to use the easements to transmit "telephone or telegraph" communications. Furthermore, there is no language in these easements limiting the defendants' use to "grantee's communications" as there is in the Type II easements. As stated above, "... it is the objective intent, the intent expressed or apparent in the writing that is sought." *Bennett*, 894 S.W.2d at 446. Therefore, a plain reading of Type III easements under the "four corners" rule leads this court to conclude that the defendants may utilize these easements for both grantee's internal communications and for third party voice and data communications.

The Texas Supreme Court has held that "... the manner, frequency and intensity of an easement's use may change over time to accommodate technological development." *Krohn*, 90 S.W.3d at 701. The use of a fiber optic line is simply a technologically advanced means of accomplishing the communicative purpose of transmitting voice and data.

The question of whether or not Type III easements permit the transmission of third party video communications is problematical. While some courts in other jurisdictions have held that the terms "telephone" or "telephonic communications" in easements permitted cable-television lines to be installed to transmit voice and video, the Texas Supreme Court has expressed

no opinion about whether these cases were correctly decided. *See Krohn*, 90 S.W.3d at 704–05. In one such case, the Fourth Circuit Court of Appeals, in applying West Virginia law, interpreted an easement allowing use of the land for "electrical and telephone service" to be sufficiently broad to encompass cable-television (video) transmissions. However, the Fourth Circuit based its decision on a finding that cable-television wires do not impose an increased burden on the servient estate. *C/R TV, Inc. v. Shannondale, Inc.*, 27 F.3d 104, 109–10 (4th Cir.1994). It is clear that whether or not a proposed use results in an increased burden on the servient estate is not the test under Texas law. The question is simply whether the grant's terms authorize the proposed use. *See Krohn*, 90 S.W.3d at 703.

This court is of the opinion that the plain, ordinary meaning of the word "telephone" refers to the transmission of sound or voice and not video. Further, the term "telegraph" refers to the transmission of data and not video. The court notes that the defendants apparently agree with this interpretation of Type III easements. In the "Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment" (Dkt.# 105) filed May 26, 2000, the defendants state on page 6 that "[t]elephones and telegraphs transmit voice and data." Therefore, with respect to Type III easements, Entergy Gulf States may install and utilize fiber optic lines for the purpose of transmitting voice and data for both internal and third party communications.

E. *Construction of Type IV Easements— Easement Language Expressly Grants "Communications" Use*

■ Similar to the Type III easements, the plain language of the Type IV

easements expressly permits the defendants to use the easements for "communications". The easement grant is not limited to grantee's internal use, and in using the term "communications", it is broader than the "telephone or telegraph" use granted in Type III easements. While the terms "telephone" and "telegraph" contemplate the transmission of voice and data, the term "communications", according to its plain, ordinary, and generally accepted meaning, would appear to include not only voice and data, but also video transmission.

Therefore, with respect to Type IV easements, Entergy Gulf States may install and utilize fiber optic lines for the purpose of transmitting voice, data and video for both internal and third party communications.

## V. ARGUMENTS RAISED IN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs contend that the four easement types—when considered in light of "attending circumstances"—unambiguously limit use of the fiber optic network to Entergy Gulf States' internal needs. Regarding Type III and Type IV easements, as stated above, the court disagrees with this contention. However, Plaintiffs submit that the court should take into consideration certain laws that they believe preclude utilization of the network for the transmission of third party communications.

A. *Applicability of* PUBLIC UTILITIES CODE *§ 181.007 to Entergy Gulf States' Ability to Use Easements to Transmit Third Party Communications*

Plaintiffs cite current chapter 181 of the PUBLIC UTILITIES CODE for the proposition that Entergy Gulf States' right to hold and use an easement is limited by the neces-

sary purposes for which the corporation was formed. This chapter provides that:

A . GAS OR ELECTRIC CORPORATION HAS THE POWER TO OWN, HOLD, OR USE LAND, A RIGHT-OF-WAY, AN EASEMENT, A FRANCHISE, OR A BUILDING OR OTHER STRUCTURE AS NECES-. SARY FOR THE PURPOSE OF THE CORPORATION.

TEX. UTIL CODE § 181.007 (emphasis added). Plaintiffs submit that using the easements for the transmission of third party communications is not a use necessary for the purposes of the corporation and is therefore a use prohibited by law.

Defendants' response is three-fold. First, they argue that section 181.007 only governs the scope of Entergy Gulf States' condemnation powers. Because the easements before the court were acquired by conveyance rather than condemnation, defendants contend this provision is inapposite. Second, defendants submit the use at issue is consistent with the section 181.007 test. Finally, defendants contend that section 181.007 must be read in conjunction with section 181.002 of the code, which states that an "electric corporation has the powers and rights of a corporation organized for profit in this state whenever those powers and duties may be applicable."

Plaintiffs counter with the argument that electrical easements are often obtained under threat of eminent domain, and as such, the transactions take place "in the shadow of a sale by compulsion." *State v. Curtis*, 361 S.W.2d 448, 450 (Tex. Civ.App.-San Antonio 1962, writ ref'd n.r.e.). They contend that easements secured under threat of eminent domain are not the result of voluntary arms-length transactions between bargaining equals. As such, plaintiffs seek to have the use restrictions applicable to property obtained through condemnation imputed to easements obtained by voluntary conveyance, regardless of the contractual language to

the contrary. Plaintiffs do not cite the court to any cases going this far, and the court declines to so hold without any precedential support under Texas law.

The cases which reference and consider the scope and applicability of section 181.007 and its previous codifications are factually premised on condemnation proceedings. *See Gulf States Util. Co. v. Tonahill,* 445 S.W.2d 593 (Tex.Civ.App.-Beaumont 1969, writ ref'd n.r.e.); *Anderson v. Clajon Gas Co.,* 677 S.W.2d 702 (Tex.App. Houston [1st Dist.] 1984, no writ); *Texas Power & Light Co. v. City of Garland,* 431 S.W.2d 511 (Tex.1968); *Roadrunner Inves., Inc. v. Texas Util. Fuel Co.,* 578 S.W.2d 151 (Tex.Civ.App.-Fort Worth 1979, writ ref'd n.r.e); *Tenngasco Gas Gathering Co. v. Fischer,* 653 S.W.2d 469 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e), *Loesch v. Oasis Pipe Line Co.,* 665 S.W.2d 595 (Tex.App.-Austin 1984, writ ref'd n.r.e.); *Arcola Sugar Mills Co. v. Houston Lighting & Power Co.,* 153 S.W.2d 628 (Tex.Civ.App.-Galveston 1941, writ ref'd w.o.m.).

 As such, the court agrees with defendants that section 181.007 does not limit the uses for which utilities can hold property obtained by voluntary agreement. As all the easements in this case were obtained by voluntary negotiations rather than condemnation proceedings, the court need not and does not reach the issue of whether an electric utility operating in the State of Texas has the authority to condemn property for the transmission of electricity and then use that easement for the transmission of third party communications.

The court concludes that section 181.007 does not limit Entergy Gulf States' power to hold easements obtained through voluntary negotiations. Plaintiffs' objection to the magistrate judge's failure to consider this provision is therefore overruled.

B. *Applicability of PUBLIC UTILITIES CODE §§ 163.013, 163.014 to Entergy Gulf States' Ability to Use Easements to Transmit Third Party Communications*

Plaintiffs also argue that Chapter 163 of the PUBLIC UTILITIES CODE circumscribes the power of Entergy Gulf States to hold and use property. Section 163.013(a) provides in relevant part that a participating entity may:

(3) acquire, for the use and benefit of each participating entity, land, easements, and property for an electric facility by purchase or by exercising the power of eminent domain; and

(4) transfer or otherwise convey the acquired land, property, or property interest or otherwise cause the land, property, or interest to become vested in other participating entities to the extent to which and in the manner in which the participating entities agree.

Section 163.014 provides:

(a) A participating entity has the power of eminent domain to be exercised as provided by this section.

(b) The use of eminent domain authority by a participating entity is governed by the law relating to an eminent domain proceeding involving a municipality in this state.

(c) A participating entity may acquire a fee title to the condemned real property.

Defendants contend these sections do not generally apply to electric utilities, but rather, only control the statutory powers of joint agencies. Chapter 163 addresses joint power agencies, which include cooperation by public and private agencies (subsection B), municipal power agencies (subsection C), agencies receiving power

through interstate systems (subsection D) and electric cooperatives (subsection E). Sections 163.013 and 163.014 fall under the rubric of "Cooperation by Public and Private Entities" (subsection B).

 The court agrees with defendants that sections 163.013 and 163.014 have no bearing on the issues at bar. It is for this reason that plaintiffs' objection to the magistrate judge's report and recommendation's failure to consider the applicability of this chapter is overruled.

C. *Whether Entergy Gulf States Is Precluded by Law and by its Corporate Charters and Articles of Incorporation from Using Easements to Transmit Third Party Communications*

Plaintiffs contend that GSU's corporate charters and articles of incorporation, read in conjunction with the law in existence at the time the easements were conveyed, precluded GSU, and now its successor-in-interest Entergy Gulf States, from using the easements to transmit third party communications. In light of this court's interpretation of the limited scope of Type I and Type II easements, this argument by the plaintiffs is moot with respect to those easements and therefore applies only to Type III and Type IV easements which encompass "telephone or telegraph use" and "communications".

Although plaintiffs' predecessors-in-interest conveyed Type III and Type IV easements to GSU granting the right to erect structures for the transmission of electricity and for "telephone or telegraph use" in Type III and for "communications" in Type IV, plaintiffs assert under an ultra vires argument that Entergy Gulf States may not fully enjoy those easements.

As both sides have pointed out in their briefing, the following language can be found in the original 1925 charter of GSU

as well as subsequent amended charters and articles of incorporation immediately following the express enumeration of the corporation's purposes:

The foregoing clauses shall be construed as objects, purposes and powers, and it is hereby expressly provided that neither the foregoing enumeration nor anything in this charter contained shall be deemed to limit or exclude any power, right or privilege given to this Corporation by law or be construed to give this Corporation any rights, powers or privileges not permitted by the laws of the State of Texas for the purposes for which this Corporation is organized.

 Although the specific enumeration of corporate purposes in these documents did not include "telephone or telegraph use" or "communications", the above language clearly states that nothing in either the specific enumeration or the entire charter "shall be deemed to limit or exclude any power, right or privilege given to this Corporation by law." The Telecommunications Act of 1996 authorized Entergy Gulf States to engage in the telecommunications business. Hence, the transmission of third. party communications is permitted by law and within the scope of the Type III and Type IV easements as previously explained.

The court does not agree with the plaintiffs' interpretation .of the above-quoted language. The plaintiffs assert that the stated non-exclusion of "any power, right, or privilege given to this Corporation by law" does not expand on the permissible corporate purposes, but only allows the corporation to engage in "any power, right or privilege" in furtherance of the specifically enumerated purposes. In the original 1925 charter, those specifically enumerated purposes are supplying water and ice as well as gas, electric and motor pow-

er to the public. The plaintiffs argue that the phrase "any power, right or privilege" must be read with and is modified by the last phrase "for the purposes for which this Corporation is organized." However, this reading ignores the fact that these two phrases are separated by the conjunction "or". That is, the last phrase in the quoted language is part of a wholly independent and separate statement that nothing in either the specific enumeration of corporate purposes or the entire charter "shall be ... construed to give this Corporation any rights, powers or privileges not permitted by the laws of the State of Texas for the purposes for which this Corporation is organized." In other words, this language simply makes it clear that the charter should never be construed to suggest that the corporation may engage in any activity or business that is unlawful.

The court is therefore of the opinion that the transmission of third party communications by Entergy Gulf States, Inc. is permitted by law and by the corporate charters and articles of incorporation, and it is within the scope of the Type III and Type IV easements.

## VI. CONCLUSION

For the reasons stated herein, the magistrate judge's "Report and Recommendation on Cross Motions for Summary Judgment" is adopted in part and rejected in part. The court concludes that Type I and Type II easements may not be used by Entergy Gulf States, Inc. to transmit third party communications. Type III easements may be used by Entergy Gulf States, Inc. to transmit third party voice and data communications. Type IV easements may be used by Entergy Gulf

States, Inc. to transmit third party voice, data and video communications. Finally, the court concludes that Type I easements grant by implication the right to use plaintiffs' property for the transmission of Entergy Gulf States, Inc.'s internal communications necessarily related to the transmission of electricity.

It is so ORDERED.

## REPORT & RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

RADFORD, United States Magistrate Judge.

Before the Court are cross motions for summary judgment: *Defendants' Motion for Summary Judgment on Construction of Easements* [Clerk's Docket No. 105] filed February 15, 2000 and *Representative Plaintiffs' Motion for Summary Judgment on Construction of Easements* [Clerk's Docket No. 113] filed April 18, 2000. Having considered the motions, responses, reply and supplement, and following hearing thereon, the Court makes this report and recommendation to the district court.

## PROCEDURAL BACKGROUND

Duane T. Corley filed a putative[1] class action lawsuit against the Entergy defendants on November 25, 1998. Following assignment to the docket of Chief Judge Richard A. Schell, all pre-trial matters were referred to this Court for disposition or recommendation. *See* 28 U.S.C. § 636(b)(1)(A),(B); *see also* FED. R. CIV. P. 72; *see also* LOCAL COURT RULES (Appendix B). Leave to add two additional representative class plaintiffs to the Corley case—

---

1. By order dated November 9, 2000, the Court reserved ruling on the class certification issues until such time as the Court considered the merits of the summary judgment

motions. The class certification issues are now ripe for scheduling and the Court will accept the parties' proposed docket control orders.

Carl E. Shrontz and William A. Roane—was subsequently granted.

Represented by the same attorneys as the Corley plaintiffs, Douglas C. Dishman and Tim E. Dishman (the Dishman plaintiffs) filed a class action complaint factually and procedurally identical to the Corley case against the same defendants on December 18, 1998. Although initially assigned to the docket of Judge Joe J. Fisher, the Dishman case was reassigned to Judge Schell and consolidated with the Corley case on February 3, 1999. As the first-filed case, the Corley case was designated as the lead case.

Cross motions for summary judgment are before the Court. As motions for summary judgment are dispositive in nature, this memorandum opinion embodies this Court's findings and recommendation to the assigned district judge as contemplated by 28 U.S.C. § 636(b)(1)(C) and Rule 72(b).

## FACTUAL BACKGROUND

Plaintiffs have rights to real property in Jefferson, Montgomery and Hardin counties. *See Defs.' Mot. for Summ. J., Exs. A, B, C, D and E.* Over the course of several decades, plaintiffs (or their predecessors in interest) granted certain easements to the Entergy defendants for the purpose of establishing an electrical power infrastructure. *Id.* At issue in this litigation is the scope of those easements.

It is undisputed that all of the easements involved in this litigation convey the right to string power cables for the purpose of transmitting electrical power across the plaintiffs' property.[2] The issue before the Court is whether the easements also convey the right to string telecommunication lines[3] across the infrastructure. If indeed the conveying languages does contemplate this use, the question then becomes whether the easements are limited to the transmission of internal communication signals by the Entergy defendants or whether the easements convey the broader right to transmit external communications unrelated to the transmission of electrical power.

Prior to 1990, copper wire was used to transmit both electricity and the Entergy defendants' internal communications. Although copper wire is still used to transmit electrical power, beginning in the 1990's, the Entergy defendants installed fiber optic cables[4] for the transmission of communications. They installed excess capacity of fiber optic cable, which has been leased to third party telecommunication providers for a fee.

---

2. Electricity is typically transmitted through overhead power cables consisting of concentrically twisted copper, aluminum or coated steel wires. *See* "Electric Power Systems," Microsoft ® Encarta ® Online Encyclopedia 2000, *available at http://encarta.msn.com.*

3. Cables used to transmit information differ from electric power cables both in function and design. "Power cables are designed for high voltages and high current loads, whereas both voltage and current in a communication cable are small." *See* "Electric Telecommunication Cables," Encyclopedia Britannica Online, *available at http://www.britannica.com.* "Power cables operate on direct current or low-frequency alternating current, while communication cables operate at higher frequencies." *Id.* "A power cable usually has not more than three conductors, each of which may be 1 inch (2.5 cm) or more in diameter; a telephone cable may have several thousand conductors, the diameter of each being less than 0.05 inch (0.125 cm)." *Id.*

4. Fiber optic cables are made of specially treated plastic or glass fibers which transmit information in the form of light pulses. *See* "Telecommunications," Microsoft ® Encarta ® Online Encyclopedia 2000, *available at http://encarta.msn.com.*

Plaintiffs contend that the easements do not convey the right to transmit communications, and, in the alternative, that if the easements do contemplate the right to transmit communications, such transmission is limited to internal communications by the Entergy defendants, thus precluding the Entergy defendants from marketing the excess fiber optic capacity to telecommunication service providers for a fee.

## LEGAL STANDARD—MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The purpose of summary judgment proceedings is to dispose of factually and legally unsupported claims and defenses. *Id.* at 323–24, 106 S.Ct. 2548.

The question whether an easement is ambiguous and the interpretation of an unambiguous easement are questions of law appropriate for consideration on motion for summary judgment. *See Hall v. Lone Star Gas Co.*, 954 S.W.2d 174, 176 (Tex.App.—Austin 1997, pet. denied).

## LEGAL BACKGROUND

### 1. *Easements Generally*

"An easement extends to certain persons the right to use the property of another for a specific purpose." *See Long Island Owner's Ass'n, Inc. v. Davidson*, 965 S.W.2d 674, 684 (Tex.App.—Corpus Christi 1998, pet. denied); *see also Cecola v. Ruley*, 12 S.W.3d 848, 852 (Tex.App.— Texarkana 2000, no pet.). An easement

does not, however, convey title to property. *Id.*

"The right to select the ... purpose of an easement belongs initially to the grantor at the time he conveys the easement." *See Holmstrom v. Lee*, 26 S.W.3d 526, 533 (Tex.App.—Austin 2000, no pet.). "Once established, the location or the character of the easement cannot be changed without the consent of the parties." *Id.*

There are two types of easements: in gross and appurtenant. *See Long Island Owner's Ass'n*, 965 S.W.2d at 684. "An easement appurtenant attaches to the land and passes with it." *Id.* An easement in gross is personal in nature, and the apportionability thereof under Texas law is subject to debate. Easements in gross were traditionally considered to be non-apportionable. "[T]he more modern view ... is that such an easement is partially alienable where it does not burden the underlying land beyond what was contemplated in the original easement grant." *See Orange County v. Citgo Pipeline Co.*, 934 S.W.2d 472, 475 (Tex.App.—Beaumont 1997, writ denied).

### 2. *Construction of Easements*

In construing easements, courts look to rules of contract interpretation. *See De-Witt County Electric Coop. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999). The court's primary purpose is to give effect to the objective intention of the parties as expressed in the instrument. The process of deed construction has been described as a three-step process. *See Terrill v. Tuckness*, 985 S.W.2d 97, 102 (Tex.App.—San Antonio 1998, no pet.).

The Court begins its analysis by examining the objective intent of the parties as expressed by the plain language of the writing—the so-called four corners rule— in the light of "attending circumstances." *See Bennett v. Tarrant County*, 894

S.W.2d 441, 447 (Tex.App.—Fort Worth 1995, writ denied); *see also Jones v. Fuller*, 856 S.W.2d 597, 603 (Tex.App.—Waco 1993, writ denied); *see also Suthers v. Booker Hosp. Dist.*, 543 S.W.2d 723, 727 (Tex.App.—Amarillo 1976, writ ref'd n.r.e.); *see also Kearney & Son v. Fancher*, 401 S.W.2d 897, 903 (Tex.Civ.App.—Fort Worth 1966, writ ref'd n.r.e.). In so doing, the granting language "is to be given its plain grammatical meaning." *See DeWitt*, 1 S.W.3d at 101. "When a court concludes that language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law." *See DeWitt*, 1 S.W.3d at 100.

If an easement cannot be construed based upon a reading of the four corners of the instrument, the court then applies established rules of construction. An easements must be construed in its entirety, so as to give effect to all provisions contained therein. *See Smart v. Tower Land and Inv. Co.*, 597 S.W.2d 333, 337 (Tex.1980). Courts construe the language against the grantor so as to give the grantee the greatest estate permissible under the instrument. *See MGJ Corp. v. City of Houston*, 544 S.W.2d 171, 174 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *see also Temple–Inland Forest Products Corp. v. United States*, 988 F.2d 1418, 1421 (5th Cir.1993). Instruments are construed against the drafter. *See Harris v. Phillips Pipe Line Co.*, 517 S.W.2d 361, 364 (Tex.Civ.App.—Austin 1974, writ ref'd n.r.e.).

If the terms are susceptible to more than one meaning after applying established rules of construction, the easement is ambiguous. Whether a term is ambiguous is a question of law for the court to decide. *See Hall v. Lone Star Gas Co.*, 954 S.W.2d 174, 176 (Tex.App.—Austin 1997, writ denied). The Texas Supreme Court revisited the issue of what constitute an ambiguous term in *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999):

> A term is not ambiguous because of a simple lack of clarity. Nor does an ambiguity arise merely because the parties to an agreement proffer different interpretations of a term. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable.

Parol evidence is admissible to construe an ambiguous easements. Courts look to the "circumstances surrounding the execution of the deed and other actions from which the grantor's intent may be implied." *See Russell v. City of Bryan*, 797 S.W.2d 112, 115 (Tex.App.—Houston [14th Dist.] 1990, writ denied). The plain and ordinary meaning of ambiguous language may be explained by evidence of custom or usage. *See Chadwick v. Esperanza Trade & Transport, Ltd.*, 548 F.2d 1161 (5th Cir. 1977).

The court may construe as a matter of law an ambiguous contract by considering undisputed evidence of the parties' intent. If there is a conflict in the parol evidence, however, the question of the parties' intent becomes one of fact, appropriate for consideration by the jury. *See Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex.1968).

### 3. *Scope and Apportionability of Easements in Gross*

A Texas court recently considered the scope and apportionability of an electrical easement in *Krohn v. Marcus Cable Assoc.*, 43 S.W.3d 577 (Tex.App.—Waco 2001, no pet. history). In *Krohn*, the plaintiff's

property was burdened by an easement for "an electric transmission or distribution line or system" secured by an electric co-operative. The electric cooperative leased space on the infrastructure to a cable television company. The court held that the cable line constituted an additional burden on the estate. Because the easement did not contemplate uses other than the transmission of electricity and did not provide for additional compensation to the landowner for stringing cable, the court held that the electric cooperative could not lease space on the infrastructure to the cable company.

On the other hand, an easement in gross that contemplates multiple pipelines and compensates the servient landowner for each additional pipeline laid is apportionable. *See Orange County*, 934 S.W.2d at 476–77. In so holding, the *Orange County* court cited with approval and did not disturb the holding in *Southwestern Bell Tel. Co. v. Texas & N.O.R. Co.*, 125 F.2d 699, 700 (5th Cir.1942). In *Southwestern Bell*, the Fifth Circuit considered the scope of an easement acquired by Southwestern Bell to erect poles and string telephone wires for its internal use. *Id.* Southwestern Bell leased space on the poles to another telephone company. The court affirmed judgment in favor of the landowner, holding that the easement did not give Southwestern Bell the right to lease its space to a third party telephone company.

The Entergy defendants cite *Mellon v. So. Pac. Transport Co.*, 750 F.Supp. 226 (W.D.Tex.1990) for the proposition that an electrical easement can be apportioned to other telecommunication providers. The Court disagrees. In *Mellon*, the plaintiff's property was burdened by a railroad right-of-way easement. The railroad entered into an agreed agreement with MCI whereby MCI agreed to install a fiber optic cable within the right-of-way and al-

low the railroad to use a portion of the cable for railroad communication purposes. Recognizing that a railroad right-of-way "is a very substantial thing" which constitutes something "more than an easement," the Court held that the test was whether the use was inconsistent with the business of the railroad. *Id.* The court held that the installation of the fiber optic cable to be used in part by the railroad for internal communication was not an inconsistent use. *Id.* As such, *Mellon* is distinguishable from the case at bar.

The Entergy defendants also rely upon cases from other jurisdictions which this Court does not find persuasive as to Texas law. *See Cousins v. Alabama Power Co.*, 597 So.2d 683 (Ala.1992)(holding that electric utility could lease space on infrastructure easement to cable company); *see also C/R TV Inc. v. Shannondale Inc.*, 27 F.3d 104 (4th Cir.1994)(easements granted to electrical company for the construction of infrastructure for the transmission of electrical and telephone wires permitted electrical company to lease space to cable company); *see also Centel Cable Television Co. v. Cook*, 58 Ohio St.3d 8, 567 N.E.2d 1010 (1991)(easement granted to utility company may be apportioned and partially assigned to a cable television company).

## ANALYSIS

The easements at issue in this litigation can be grouped into four categories based upon the scope of the conveying language.

### 1. Type I Easement—Electricity Only

The following easement was conveyed by William A. Roane's predecessor in interest to the Entergy defendants:

THE RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON AND TO CONSTRUCT, MAINTAIN, OPERATE, INSPECT, PATROL, REPLACE, REPAIR, AND REMOVE TWO LINES OF STRUCTURES, FOR ONE OR MORE CIRCUITS

EACH, COMPOSED OF WOOD, METAL OR OTHER TYPES OF MATERIAL WITH LINES OF WIRES, CROSSARMS, GUY WIRES, STUBS, FOUNDATIONS, ANCHORS AND OTHER USUAL FIXTURES FOR THE TRANSMISSION OF ELECTRICITY. . . .

*See Plfs.' Ex. F* (EGSI 01119)(emphasis added). The Court concludes that the Type I easement unambiguously conveys to the Entergy defendants nothing more than the right to use the easement for the purpose of transmitting electrical power. As previously noted, power lines and communication lines differ in both function and design. As such, the right to install a communication line is not implicit in the conveyance of the right to install power lines. Fiber optic cables cannot be used to transmit electricity and, for this reason, the Entergy defendants may not install fiber optic cables across the Type I easements under the terms of the conveyance. There is no reading of the plain language that suggests that the objective intent of the parties was to convey the right to install any lines other than those used to deliver electrical power. As such, this Court recommends that summary judgment be granted in favor of plaintiffs with respect to all easements containing language limiting use of the easements to the transmission of electricity.

### 2. *Type II Easements—Electricity and Entergy's Internal Communications*

The deed relevant to Duane T. Corley's claim conveys to the Entergy defendants:

The Right, Privilege And Easement To Enter Upon And To Erect, Construct, Maintain, Operate, Inspect, Replace, Repair, Patrol, And Remove One Or More Lines Of Wood Or Metal Structures (3)27 With Lines Of Wires, Crossarms, Guy Wires, Conduits, Stubs And Other Usual Fixtures For The Transportation Of Electricity And Grantees [Sic] Communications. . . .

*See Pls.' Ex. E* (emphasis added). The Court concludes that the objective intent of the parties based upon the four corners of the Type II conveyance was to allow the Entergy defendants to use the easement for the transmission of electrical power and their internal communications. Because the conveying language contemplates transmission of communications, the Entergy defendants may install fiber optic lines across the easements. However, use of those communication lines is limited to the transmission of Entergy's internal communications. In other words, the Entergy defendants may not lease excess capacity space on the fiber optic network to third party telecommunication providers. *See Orange County,* 934 S.W.2d at 476–77; *see also Southwestern Bell Tel. Co. v. Texas & N.O.R.,* 125 F.2d at 700. As such, this Court recommends that summary judgment be granted in favor of plaintiffs on the construction of the Type II easements.

### 3. *Type III Easements—Electricity and Telephone*

The Entergy defendants also secured easements across property now owned by Douglas C. Dishman and Tim E. Dishman. Their separately owned property is subject to easements identically worded, providing:

THE PERPETUAL RIGHT, PRIVILEGE AND EASEMENT TO ENTER UPON, TO ERECT, CONSTRUCT, EXTEND, MAINTAIN, INSPECT, OPERATE, REPLACE, REMOVE, REPAIR AND PATROL ONE OR MORE LINES OF POLES OR TOWERS . . . WITH LINES OF WIRES, CROSSARMS, GUY WIRES, CONDUITS, STUBS AND OTHER USUAL FIXTURES, APPLIANCES AND APPURTENANCES USED OR ADAPTED FOR THE TRANSMISSION OF ELECTRICITY, ELECTRIC ENERGY AND POWER FOR ANY AND ALL PURPOSES FOR WHICH ELECTRICITY, ELECTRIC ENERGY, AND POWER IS NOW OR

May Hereafter Be Used, And For Telephone Or Telegraph Use....

*See Defs.' Exs. A & B* (emphasis added). The Type III easements convey the right to transmit electrical power and telephone/telegraph signals. After applying established rules of construction, the Court concludes that the Type III easement is ambiguous in that it is susceptible to more than one reasonable interpretation. The Court must, therefore, resort to parol evidence to construe the parties' intent. Because there is a conflict in the parol evidence regarding the parties' intent, the Court recommends that the interpretation of the conveyance proceed to trial by jury. As such, the Court recommends that summary judgment on the construction of the Type III easements be denied.

4. *Type IV Easements—Electricity and Communications*

The deed relating to the property now owned by Carl E. Shrontz conveys:

The Right, Privilege And Easement To Enter Upon And To Construct, Maintain, Operate, Inspect, Patrol, Replace, Repair, Patrol And Remove One Or More Lines Of Structures For One Or More Circuits ... With Lines Of Wires, Crossarms, Guy Wires, Stubs, Foundations, Anchors And Other Usual Fixtures For The Transmission Of Electricity And Communications....

*See Defs.' Ex. C* (emphasis added). The Type IV easement is the broadest of the four conveyances at issue, conveying the right to use the easement for the transmission of electricity and communications generally. After applying established rules of construction, the Court concludes that the Type IV easement is also ambiguous in that it is susceptible to more than one reasonable interpretation. The Court must, therefore, resort to parol evidence to construe the parties' intent. Because there is a conflict in the parol evidence regarding the parties' intent, the Court recommends that the interpretation of the conveyance proceed to trial by jury. As such, the Court recommends that summary judgment on the construction of the Type IV easement also be denied.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the district court GRANT plaintiffs' motion for summary judgment on the construction of the Type I (electricity only) and Type II (electricity and Entergy's internal communication) easements.

IT IS FURTHER RECOMMENDED that the district court DENY plaintiffs' and defendants' motions for summary judgment on the construction of the Type III (electricity and telephone) and Type IV (electricity and communication) easements.

## OBJECTIONS

The district court will make a *de novo* review of this report and recommendation in the event that objections are properly raised. Objections must be: (1) specific; (2) in writing; and (3) filed within ten days after date of service of this report and recommendation. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). A response to any objection must be filed not more than ten days after the date the objection was served. *Id.* Failure to timely object to a report and recommendation limits that party's entitlement to *de novo* review by the district court and appellate review of anything other than plain error. *See Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir.1996)(en banc).

March 27, 2001.