In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-07-00734-CV

____________


CENTERPOINT ENERGY HOUSTON ELECTRIC LLC AND
SPRINTCOM, INC., Appellants


V.


BLUEBONNET DRIVE, LTD. AND PETRO-GUARD COMPANY, INC.,
Appellees






On Appeal from the 333rd District Court 

Harris County, Texas

Trial Court Cause No. 2004-18785 





O P I N I O N



 This dispute concerns interpretation of an express utility easement granted in
1929 to Houston Lighting & Power Company (HL&P), the predecessor-in-interest
of appellant, CenterPoint Energy Houston Electric LLC (CenterPoint). Appellees,
Bluebonnet Drive, Ltd. (Bluebonnet) and Petro-Guard Co., Inc. (Petro-Guard) are
the current owners of the servient estate on which the easement is located. Their
suit against CenterPoint and appellant, SprintCom, Inc. (Sprint) is grounded in
CenterPoint's granting Sprint permission to install wireless, or cellular,
telecommunications equipment within the easement. Bluebonnet and Petro-Guard
contend that installing wireless equipment exceeds the scope of CenterPoint's
easement and thus constitutes a trespass that warrants damages, injunctive relief,
and attorney's fees. The trial court resolved this issue by summary judgment
before trial began, submitted the case to a jury for determination of damages and
applicability of the discovery rule for limitations, and then conducted a bench trial
on the claim for injunctive relief and attorney's fees. In the first of their seven
issues, CenterPoint and Sprint challenge the trial court's ruling that a trespass had
occurred. We agree that no trespass occurred and thus need not address the
remaining issues. We reverse and render judgment in favor of CenterPoint and
Sprint. 

Background


 The easement is located on commercial property at 8411 Gulf Freeway in
Houston. CenterPoint's predecessor, HL&P, acquired the easement in 1926 from
the San Jacinto Trust Company pursuant to the following grant:

 KNOW ALL MEN BY THESE PRESENTS: That San Jacinto Trust
Company, a corporation under the laws of Texas, with its principal
office and place of business in Houston, Harris County, Texas, for and
in consideration of the sum of Five Dollars ($5.00) to it cash in hand
paid by Houston Lighting & Power Company, receipt of which is
hereby acknowledged, and of other good and valuable considerations
from Houston Lighting & Power Company to it moving, HAS
GRANTED, SOLD AND CONVEYED, and does by these presents
GRANT, SELL AND CONVEY, unto the said Houston Lighting &
Power Company, a corporation under the laws of Texas, with its
domicile in Houston, Harris County, Texas, a rightofway or easement
for electric transmission and distributing lines consisting of variable
numbers of wires and all necessary and desirable appurtenances
(including towers or poles made of wood, metal or other materials,
telephone and telegraph wires, props and guys), upon, over, along and
across that certain strip of land twenty-five (25) feet in width, out of
the John R. Harris and Callahan-Vince Surveys, in Harris County,
Texas, the center line of which twenty-five foot strip is described by
[metes and bounds description follows]. (1)


(Emphasis added.) 

 On this particular site, CenterPoint has a metal electrical tower and at least
one additional wooden utility pole within its easement, which is part of a very long
right-of-way that connects from one power plant substation to another. The
electrical tower, built in 1998, surrounds one of the original wooden utility poles at
the site. Kevin Mills, who manages surveying and right-of-ways for CenterPoint,
explained his familiarity with easements and stated that it was common practice to
include permission for telephone and telegraph lines in granting an electric
easement so that both utilities might share a common pole and thereby avoid
erecting an additional pole. On the tower installed at this site, CenterPoint's
electrical lines are above the telephone lines. Robert Page, who had been with
CenterPoint and its predecessor since 1971, explained that the company requires a
certain clearance between the two sets of lines and that phone lines typically follow
electrical lines. It is undisputed that this easement has been shared since the 1970's
with Southwestern Bell Telephone (now AT&T), which mounts and strings land-line telephone lines on CenterPoint's poles. The record also shows that there is no
separate telephone easement on the site, and that this is true for most instances in
which CenterPoint has shared its easements for land-line telephone transmission.

 In early 1998, HL&P and Sprint entered into an agreement to install Sprint's
wireless telecommunication equipment and related telecommunications equipment
on existing electrical towers in Houston. The Gulf Freeway site is listed as "Site
121" in the agreement. HL&P installed Sprint's wireless communications
equipment within the CenterPoint easement in summer 1998. The equipment
consists of the following components: a triangular wireless communications
center, or antenna, placed at the top of existing tower; a 96-foot pipe that runs
through the center of CenterPoint's existing tower and supports the
communications center; and metal radio boxes, located at the base of the tower,
that are mounted on a foundation and surrounded by chain-link fencing. Wires and
cables pass from the radio boxes and to the center pole to connect to the antenna.

 Bluebonnet and Petro-Guard purchased the commercial property at 8411
Gulf Freeway in 2004. (2) They sued CenterPoint and Sprint shortly thereafter,
claiming that use of the tower and appurtenant structures exceeded the scope of
CenterPoint's easement and constituted a trespass. In addition to trespass,
Bluebonnet's and Petro-Guard's claims included easement abuse, unjust
enrichment, tortious interference with contract, fraud, and fraudulent concealment,
both as to the alleged trespass and as to Bluebonnet's and Petro-Guard's discovery
of the trespass; they sought declaratory relief, an injunction, actual damages,
attorney's fees and costs, and punitive damages. 

 The parties filed several dispositive motions before trial. These included
cross-motions for summary judgment concerning the trespass claim, which
required interpretation of the scope of the easement. In granting Bluebonnet's and
Petro-Guard's motion for partial summary judgment and denying CenterPoint's
and Sprint's motion, the trial court concluded that CenterPoint's and Sprint's use
of the easement exceeded the scope of the easement as a matter of law and thus
constituted a trespass. (3) 

 At the close of the jury trial, Bluebonnet and Petro-Guard nonsuited their
fraud claim, and the trial court directed verdicts on their claims for unjust
enrichment, tortious interference, fraudulent concealment, and punitive damages.
The jury determined that the discovery rule tolled limitations, and that Bluebonnet
and Petro-Guard had incurred damages for lost rents of $64,107.45, from July 22,
1998 to April 12, 2002, and $101,623.27, from April 13, 2002 to the time of trial.
The trial court then conducted a bench trial on Bluebonnet's and Petro-Guard's
request for injunctive relief and attorney's fees and signed findings of fact and
conclusions of law in support of those rulings. The final judgment challenged here
(1) enjoined CenterPoint and Sprint from using CenterPoint's easement for
wireless communication, (2) required that Sprint remove its equipment from the
property, and (3) awarded Bluebonnet and Petro-Guard damages, interest, and
costs against both CenterPoint and Sprint and attorney's fees against CenterPoint. 

Whether the Easement Encompasses Use for Cellular Transmission


 In their first issue, CenterPoint and Sprint challenge the trial court's
conclusion that CenterPoint's and Sprint's use of cellular transmission equipment
within the easement "exceeds the scope of the easement as a matter of law." (4) They
argue that the trial court misinterpreted the easement as foreclosing installation of
Sprint's wireless communications equipment and therefore erred by concluding
that the use constituted a trespass. As in the trial court, CenterPoint and Sprint
contend that no trespass occurred, and that they did not exceed the permissible
scope of the easement because the easement expressly permits installation of both
"electric transmission and distributing lines," and "all necessary and desirable
appurtenances . . . including . . . telephone and telegraph wires."

A. Easements and Trespass 

 "An easement is a non-possessory interest that authorizes its holder to use
property for a particular purpose." Koelsch v. Indus. Gas Supply Corp. 132
S.W.3d 494, 497 (Tex. App.--Houston [1 Dist.] 2004, pet. denied) (citing Marcus
Cable Assocs. v. Krohn, 90 S.W.3d 697, 700 (Tex. 2002)). A trespasser has neither
express nor implied permission to enter the property of another, but enters it
nonetheless. Mellon Mortgage Co. v. Holder, 5 S.W.3d 654, 671 (Tex. 1999);
Koelsch, 132 S.W.3d at 497. An easement holder who exceeds the rights granted
by the owner of the servient estate thus commits a trespass. Marcus Cable, 90
S.W.3d at 703 (quoting McDaniel Bros. v. Wilson, 70 S.W.2d 618, 621 (Tex. Civ.
App.--Beaumont 1934, writ ref'd) ("[E]very unauthorized entry upon land of
another is a trespass even if no damage is done or the injury is slight. . . . .")); see
Koelsch, 132 S.W.3d at 499 (holding that no trespass occurred because easement
permitted construction and relocation of above-ground block valve assembly). A
party claiming trespass must establish that the defendant committed an act that
exceeded the bounds of any legal rights the defendant may have possessed. See
Koelsch, 132 S.W.3d at 497 (citing Murphy v. Fannin County Elec. Coop., 957
S.W.2d 900, 903-04 (Tex. App.--Texarkana 1997, no pet.)). 

 In this case, the trial court concluded, as a matter of law, that (1) CenterPoint
and Sprint exceeded the rights acquired by the 1926 easement by permitting
placement of Sprint's cellular telecommunications equipment within the easement
and (2) therefore committed a trespass. See id. 

B. Assignability of Easement Rights

 CenterPoint claims its rights in this case pursuant to the express easement
conveyed to HL&P in 1926. See Marcus Cable, 90 S.W.3d at 700 (citing DeWitt
County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 103 (Tex. 1999)). Sprint's rights
derive from CenterPoint's rights. An easement holder who is authorized to assign
or apportion rights to a third party (5) must conform the rights conveyed to the third
party to those originally conveyed. See id. (citing Cantu v. Cent. Power & Light
Co., 38 S.W.2d 876, 877 (Tex. Civ. App.--San Antonio 1931, writ ref'd)). 
Accordingly, CenterPoint could not grant Sprint any use that "exceed[ed] the rights
expressly conveyed to the original easement holder," here HL&P, and, by
succession, CenterPoint. See id.; see also Carrithers v. Terramar Beach Cmty.
Improvement Ass'n, Inc., 645 S.W.2d 772, 774 (Tex. 1983) ( "[A]n easement may
not create a right or interest in a grantee's favor which the grantor himself did not
possess.") (citing Drye v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 202 (Tex.
1962)). 

C. Interpretation of Easements

 We interpret easements according to basic principles of contract construction
and interpretation. Marcus Cable, 90 S.W.3d at 700; DeWitt County Elec. Coop., 1
S.W.3d at 100; Koelsch, 132 S.W.3d at 497. Courts construe contracts as a matter
of law, and we review their rulings de novo. See J.M Davidson, Inc. v. Webster,
128 S.W.3d 223, 226, 229 (Tex. 2003) (applying rule in arbitration-agreement
context) (citing Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983)). The intent of
the parties, as expressed in the grant, determines the scope of the interest conveyed. 
Marcus Cable, 90 S.W.3d at 700-01; Koelsch, 132 S.W.3d at 497-98. To interpret
the parties' intentions adequately and to discern the scope of the rights conveyed to
the easement holder, we focus on the terms of the granting language. See Marcus
Cable, 90 S.W.3d at 701 (citing DeWitt County Elec. Coop., 1 S.W.3d at 103 and
Houston Pipe Line Co. v. Dwyer, 374 S.W.2d 662, 664-65 (Tex. 1964)); Koelsch,
132 S.W.3d at 497-98; see also Marcus Cable, 90 S.W.3d at 701 (citing and
quoting Restatement (Third) of Property (Servitudes) § 4.1) (providing that
an easement "should be interpreted to give effect to the intention of the parties
ascertained from the language used in the instrument, or the circumstances
surrounding the creation of the servitude, and to carry out the purpose for which it
was created")). 

 We rely solely on the written terms of the easement unless the language is
ambiguous. Koelsch, 132 S.W.3d at 498. (6) When terms are not defined, we give
them their "plain, ordinary, and generally accepted meaning." Marcus Cable, 90
S.W.3d at 701 (citing DeWitt County Elec. Coop., 1 S.W.3d at 101). Courts must
consider the entire writing, assume that the parties intended to give effect to every
clause they chose to include, and strive to harmonize and give effect to all the
provisions of the contract by analyzing the provisions with reference to the whole
agreement. Frost Nat'l Bank v. L&F Distribs., 165 S.W.3d 310, 312 (Tex. 1999);
Koelsch, 132 S.W.3d at 498; Corley v. Entergy Corp., 246 F. Supp. 2d 565, 573
(E.D. Tex. 2003); see also Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207
S.W.3d 342, 345 (Tex. 2006) (construing contract for sale of oil and gas working
interest and stating that courts must "examine and consider the entire writing in an
effort to harmonize and give effect to all the provisions . . . so that none will be
rendered meaningless" and that "[n]o single provision taken alone will be given
controlling effect," but that "all the provisions must be considered with reference
to the whole instrument"). 

 When interpreting the granting language of an easement, we resolve doubts
about the parties' intent against the grantor, or servient, estate and adopt the
interpretation that is the least onerous to the grantee, or dominant, estate in order to
confer on the grantee the greatest estate permissible under the instrument. See
Houston Pipe Line Co. v. Dwyer, 374 S.W.2d 662, 665 (Tex. 1964); Stevens v.
Galveston, H. & S.A. Ry. Co., 212 S.W. 639, 644 (Tex. Comm. App. 1919); Gulf
View Courts, Inc. v. Galveston County, 150 S.W.2d 872, 874 (Tex. Civ.
App.--Galveston, 1941, writ ref'd). (7) 

 No rights pass to the easement holder by implication except those that are
"reasonably necessary" to enjoy the rights that the easement grants expressly.
Marcus Cable, 90 S.W.3d at 701 (citing Coleman v. Forister, 514 S.W.2d 899, 903
(Tex. 1974)). Accordingly, if the grant expressed in the easement cannot be
construed to apply to a particular purpose, a use for that purpose is not allowed.
See id. In Marcus Cable, the supreme court construed an easement that granted an
electrical utility permission to construct and maintain "an electric transmission or
distribution line or system" over private real property. Id., 90 S.W.3d at 699. In
1991, Marcus Cable obtained permission from the utility to attach cable lines and
wiring to the utility's poles, but its agreement with the utility limited use of the
poles to lawful activity by the utility. Id. The property owners sued, claiming that
the cable company did not have a valid easement and that they had not consented
to the placement of the cable lines across their property. Id. The supreme court
held that the grant expressed in the easement encompassed only an "electric
transmission or distribution line or system" and therefore did not encompass use
for cable television transmission. 90 S.W.3d at 706. 

 Yet, Marcus Cable acknowledged that the common law permits some
flexibility in determining an easement holder's rights because the manner,
frequency, and intensity of use of an easement "may change over time to
accommodate technological development." Id., 90 S.W.3d at 701 (citing
Restatement (Third) of Property (Servitudes) § 4.1). Changes must,
however, "fall within the purposes for which the easement was created, as
determined by the grant's terms." See id. (citing Restatement (Third) of
Property (Servitudes) §§ 1.2 cmt. d ("The holder of the easement . . . is entitled
to make only the uses reasonably necessary for the specified purpose."); 4.10 &
cmt. a (noting that manner, frequency, and intensity of easement may change to
take advantage of technological advances, but only for purposes for which
easement was created)). Accordingly, an express easement "encompasses only
those technological developments for which the easement was granted." Id., 90
S.W.3d at 702 (citing Restatement (Third) of Property (Servitudes) §§ 1.2
cmt. d, cmt. a, 4.10 & cmt. a). 

 In Marcus Cable, the supreme court construed the utility easement as limited
to the purpose of conveying electricity by demonstrating that settled law had
interpreted the terms "electric transmission" and "electric distribution" as referring
exclusively to conveyances of electricity. Id., 90 S.W.3d at 703-04. Accordingly,
the court declined to permit a use by Marcus Cable that went beyond conveying
electricity. Id., 90 S.W.3d at 704. 

 We distinguish Marcus Cable, however, because there was never an
argument in that case that the express grant to the utility--to construct and
maintain an "electric transmission or distribution line or system"--was broad
enough to encompass use for cable-television transmission. See id., 90 S.W.3d at
704. To the contrary, the cable company maintained that it should be permitted to
use the utility's poles, despite the narrow language of the easement, for the
following reasons: (1) easements should be construed to encompass technical
advances, (2) public policy favored expansion of cable-television services, and (3)
adding cable-television wires to existing poles did not increase the burden on the
property owners (the servient estate). See id. 

D. Discussion

 1. The Plain Terms of the Easement

 In contrast to the cable company's position in Marcus Cable, which would
have required that the limited purpose stated in the express easement be
impermissibly expanded, see id., CenterPoint and Sprint contend, and we agree,
that the plain terms of the express easement here are amply sufficient to encompass
use of CenterPoint's easement for Sprint's cellular transmission lines and
equipment. 

 The express easement conveyed to CenterPoint, as HL&P successor, grants a
right-of-way not only for "electric transmission and distributing lines consisting of
variable numbers of wires," but also for "all necessary and desirable
appurtenances." The easement then specifies that "necessary and desirable
appurtenances" includes "towers or poles made of wood, metal or other materials,
telephone and telegraph wires, props and guys." 

 The plain meaning of these terms conveys the right to install
"appurtenances" as "additions" or "attachments" when "necessary and desirable." 
See Univ. of Tex. Med. Branch v. Davidson, 882 S.W.2d 83, 86 (Tex.
App.--Houston [14th Dist.] 1994, no writ) (interpreting "appurtenance" as
"addition" "attached" to something else). The plain meaning of these terms further
specifies that "telephone and telegraph wires" are among the appurtenances that
may be installed when necessary and desirable. That the easement expressly
retains other utility rights--"water, gas, sewerage, and the like"--but is silent
regarding telephone rights reinforces our interpretation. See Frost Nat'l Bank, 165
S.W.3d at 312; Koelsch, 132 S.W.3d at 498; Corley, 246 F. Supp. 2d at 573
(emphasizing that all terms of instrument must be considered).

 Bluebonnet and Petro-Guard dispute this interpretation and contend, as in
the trial court, that the easement permits telephone and telegraph wires only as
"necessary and desirable" for CenterPoint's internal communications utilized to
control the flow of electricity. We agree with CenterPoint and Petro-Guard that the
language and terms of the easement do not support this restrictive interpretation. 

 In interpreting the permission conveyed by an easement, we consider the
terms used, and all of the terms used, in order to give effect to all provisions. See
Marcus Cable, 90 S.W.3d at 701, DeWitt County Elec. Coop., 1 S.W.3d at 103,
Koelsch, 132 S.W.3d at 498; Corley, 246 F. Supp. 2d at 573. But we rely solely on
those terms except in the case of ambiguity, Koelsch, 132 S.W.3d at 498, which is
not an issue here. We may not, therefore, add terms not present in the easement, as
Bluebonnet's and Petro-Guard's contention would require. (8) See Am. Mfrs. Mut.
Ins. Co. v. Schaefer, 124 S.W.3d 154, 161-63 (Tex. 2003) (stating, in context of
insurance-coverage determination, "we may neither rewrite the parties' contract
nor add to its language"); Helmerich & Payne Int'l Drilling Co. v. Swift Energy
Co., 180 S.W.3d 635, 640-42 (Tex. App.--Houston [14th Dist.] 2005, no pet.)
(declining to "rewrite" drilling contract or "add to it under the guise of
interpretation"); see also Oxford v. Williams Cos., 154 F. Supp. 2d 942, 949-50
(E.D. Tex. 2001) (memo op.) (holding that language of easement did not support
restrictive interpretation proposed by landowner owners of servient estate).

 2. Technological Advancement or Development 

 CenterPoint and Sprint acknowledge that the terms of the easement address
only "telephone and telegraph wires," in keeping with the known technology of
1926, and thus do not expressly convey rights to wireless telephone transmission
and equipment as appurtenances that are "necessary and desirable." They contend,
however, that in Marcus Cable, the supreme court recognized the technological
advancement doctrine and that the doctrine applies to permit the installations
permitted by CenterPoint's agreement with Sprint. We agree. 

 The common law recognizes that the "manner, frequency, and intensity of an
easement's use may change over time to accommodate technological advances"
and thus permits "some flexibility in determining an easement holder's rights," as
long as the changes respect the original purpose stated in the terms of the grant. 
Marcus Cable, 90 S.W.3d at 701-02 (citing Restatement (Third) of Property
(Servitudes) §§ 4.10 & cmt. a, 1.2 cmt. d.). The doctrine did not apply in Marcus
Cable because the express easement at issue in that case could not be construed as
permitting any purpose beyond electrical transmission. 90 S.W.3d at 702-03. 

 In this case, however, the plain terms of CenterPoint's express easement
reflect not only electrical transmission as a purpose of the easement, but also
telephone and telegraph transmission as a purpose of the easement. An express
easement properly encompasses technological developments that "further the
particular purpose for which the easement is granted." Id. (citing Restatement
(Third) of Property (Servitudes) §§ 1.2 cmt. d, cmt. a, 4.10 & cmt. a). Citing
the Restatement, Marcus Cable expressly recognized, as an example of appropriate
application of the doctrine of technological advancement or development, that a
holder of an easement granted in 1940 for the purpose of telephone transmission
could properly attach transmitters to its poles for cellular telephone transmissions
unless that use would interfere unreasonably with the servient estate. See id., 90
S.W.3d at 702 (citing Restatement (Third) of Property (Servitudes) § 4.10
illus. 13); see also Corley, 246 F. Supp.2d at 578-79 (holding that easements using
terms "telephone," "telegraph," and "communications" could properly be utilized
for both internal communications and for third-party voice and data
communications).

 We hold that the express terms of the CenterPoint easement encompass
installation and use of cellular transmission within the easement, and that
CenterPoint did not exceed the scope of the easement in assigning those rights to
Sprint. Accordingly, the trial court erred by concluding that CenterPoint and
Sprint had exceeded the scope of the easement. 

 We sustain CenterPoint's and Sprint's first issue. Because this disposition
compels that we reverse and render judgment that Bluebonnet and Petro-Guard
take nothing on their claims against CenterPoint and Sprint, we need not address
their remaining issues. 

Conclusion


 We reverse the judgment of the trial court and render a take-nothing
judgment against Bluebonnet and Petro-Guard. 




 Sherry Radack


 Chief Justice


Panel consists of Chief Justice Radack and Justices Nuchia and Keyes. 
1. The parties do not dispute the physical boundaries of the easement.
2. A bank has leased the property since 1991. Bluebonnet and Petro-Guard became the
bank's landlords when they purchased the property in 2004. 
3. In addition, the trial court denied CenterPoint's and Sprint's motion for summary
judgment on limitations, their motion to dismiss for lack of subject-matter
jurisdiction, and their objections to any references before the jury regarding the trial
court's having determined that CenterPoint's and Sprint's use of the easement
constituted a trespass. 
4. The trial court reached this conclusion in response to the parties' cross-motions for
summary judgment, which the trial court resolved by rendering partial summary
judgment in favor of Bluebonnet and Petro-Guard. This interlocutory judgment
became merged with the final judgment at the close of trial. See Webb v. Jorns, 488
S.W.2d 407, 409 (Tex. 1972) (stating that interlocutory judgment becomes final
judgment when it merges into final judgment disposing of whole case); see also C.M.
Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 779 n.9 (Tex. App.--Houston [1st
Dist.] 2004, no pet.) (citing Newco Drilling Co. v. Weyand, 960 S.W.2d 654, 656
(Tex. 1998) (stating general rule that interlocutory summary judgment is final as to
issues addressed when rendered and becomes final and appealable when merged into
final judgment)). CenterPoint and Sprint further preserved the challenge presented
in their first issue in their motion for judgment notwithstanding the verdict, in which
they claimed that their use of the easement did not exceed its scope, and that no
trespass occurred, which precluded any judgment in favor of Bluebonnet and Petro-Guard. The trial court denied the motion for judgment notwithstanding the verdict. 

5. CenterPoint's authority to assign its easement rights was not a contested issue.
6. The language of an easement is not ambiguous when the terms can be given a certain
or definite meaning, in which case we interpret the easement as a matter of law. See
DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 2002). Terms are
not ambiguous simply because they are not clear or because the parties proffer
differing interpretations of them. Id. Ambiguity arises only when applying the
established rules of construction results in more than one equally reasonable
interpretation. Id.; see Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312
(Tex. 2005) (interpreting term equipment-lease agreement with purchase-option
provision). In this case, the parties' postures in filing cross-motions for summary
judgment as a matter of law belie claims of ambiguity, despite CenterPoint's and
Petro-Guard's having asserted ambiguity as an alternative claim. 
7. This rule applies when the language used to accord rights is doubtful or less than
clear; the rule does not apply when an instrument is subject to more than one
reasonable interpretation and is, therefore, ambiguous, in which case the instrument
is construed against its author. See Houston Pipe Line Co. v. Dwyer, 374 S.W.2d 662,
665 (Tex. 1964). There is no claim of ambiguity here, and the latter rule does not
apply. 
8. In Corley v. Entergy Corp., 246 F. Supp. 2d 565 (E.D. Tex. 2003), the federal district
court construed an easement as expressly restricted to electrical transmissions and
internal communications, but based its holding on the plain language of the easement,
which stated that restriction. 246 F. Supp.2d at 577-78.