CENTERPOINT ENERGY HOUSTON ELECTRIC LLC and SprintCom, Inc., Appellants,

v.

BLUEBONNET DRIVE, LTD. and Petro–Guard Company, Inc., Appellees.

No. 01–07–00734–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 31, 2008.

Rehearing Overruled Oct. 13, 2008.

Amy L. Snell, Shipley Snell Montgomery, LLP, John V. Anaipakos, Karlene Dunn Poll, Baker Botts, L.L.P., Houston, TX, Rob L. Wiley, Stewart & Wiley LLP, Spring, TX, for Appellants.

Charles L. Fridge III, Fridge & Resendez, LLC, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices NUCHIA and KEYES.

## OPINION

SHERRY RADACK, Chief Justice.

This dispute concerns interpretation of an express utility easement granted in 1929 to Houston Lighting & Power Company (HL & P), the predecessor-in-interest of appellant, CenterPoint Energy Houston Electric LLC (CenterPoint). Appellees, Bluebonnet Drive, Ltd. (Bluebonnet) and Petro–Guard Co., Inc. (Petro–Guard) are the current owners of the servient estate on which the easement is located. Their suit against CenterPoint and appellant, SprintCom, Inc. (Sprint) is grounded in CenterPoint's granting Sprint permission to install wireless, or cellular, telecommunications equipment within the easement. Bluebonnet and Petro–Guard contend that installing wireless equipment exceeds the scope of CenterPoint's easement and thus constitutes a trespass that warrants damages, injunctive relief, and attorney's fees. The trial court resolved this issue by summary judgment before trial began, submitted the case to a jury for determination of damages and applicability of the discovery rule for limitations, and then conducted a bench trial on the claim for injunctive relief and attorney's fees. In the first of their seven issues, CenterPoint and Sprint challenge the trial court's ruling that a trespass had occurred. We agree that no trespass occurred and thus need not address the remaining issues. We reverse and render judgment in favor of CenterPoint and Sprint.

## Background

The easement is located on commercial property at 8411 Gulf Freeway in Houston. CenterPoint's predecessor, HL & P, acquired the easement in 1926 from the San Jacinto Trust Company pursuant to the following grant:

KNOW ALL MEN BY THESE PRESENTS: That San Jacinto Trust Company, a corporation under the laws of Texas, with its principal office and place of business in Houston, Harris County, Texas, for and in consideration of the sum of Five Dollars ($5.00) to it cash in hand paid by Houston Lighting & Power Company, receipt of which is hereby acknowledged, and of other good and valuable considerations from Houston Lighting & Power Company to it moving, HAS GRANTED, SOLD AND CONVEYED, and does by these presents GRANT, SELL AND CONVEY, unto the said Houston Lighting & Power Company, a corporation under the laws of Texas, with its domicile in Houston, Harris County, Texas, *a rightofway or easement for electric transmission and distributing lines consisting of variable numbers of wires and all necessary and desirable appurtenances (including towers or poles made of wood, metal or other materials, telephone and telegraph wires, props and guys)*, upon, over, along and across that certain strip of land twenty-five (25) feet in width, out of the John R. Harris and Callahan–Vince Surveys, in Harris County, Texas, the center line of which twenty-five foot strip is described by [metes and bounds description follows].[1]

(Emphasis added.)

On this particular site, CenterPoint has a metal electrical tower and at least one additional wooden utility pole within its easement, which is part of a very long right-of-way that connects from one power plant substation to another. The electrical tower, built in 1998, surrounds one of the original wooden utility poles at the site. Kevin Mills, who manages surveying and right-of-ways for CenterPoint, explained his familiarity with easements and stated that it was common practice to include permission for telephone and telegraph lines in granting an electric easement so that both utilities might share a common pole and thereby avoid erecting an additional pole. On the tower installed at this site, CenterPoint's electrical lines are above the telephone lines. Robert Page, who had been with CenterPoint and its predecessor since 1971, explained that the company requires a certain clearance between the two sets of lines and that phone lines typically follow electrical lines. It is undisputed that this easement has been shared since the 1970's with Southwestern Bell Telephone (now AT & T), which mounts and strings land-line telephone lines on CenterPoint's poles. The record also shows that there is no separate telephone easement on the site, and that this is true for most instances in which CenterPoint has shared its easements for land-line telephone transmission.

In early 1998, HL & P and Sprint entered into an agreement to install Sprint's wireless telecommunication equipment and related telecommunications equipment on existing electrical towers in Houston. The Gulf Freeway site is listed as "Site 121" in the agreement. HL & P installed Sprint's wireless communications equipment within the CenterPoint easement in summer 1998. The equipment consists of the following components: a triangular wireless communications center, or antenna, placed at the top of existing tower; a 96–foot pipe that runs through the center of CenterPoint's existing tower and supports the communications center; and metal radio boxes, located at the base of the tower, that are mounted on a foundation and surrounded by chain-link fencing. Wires and cables pass from the radio boxes and to the center pole to connect to the antenna.

---

1. The parties do not dispute the physical boundaries of the easement.

Bluebonnet and Petro–Guard purchased the commercial property at 8411 Gulf Freeway in 2004.[2] They sued CenterPoint and Sprint shortly thereafter, claiming that use of the tower and appurtenant structures exceeded the scope of Center-Point's easement and constituted a trespass. In addition to trespass, Bluebonnet's and Petro–Guard's claims included easement abuse, unjust enrichment, tortious interference with contract, fraud, and fraudulent concealment, both as to the alleged trespass and as to Bluebonnet's and Petro–Guard's discovery of the trespass; they sought declaratory relief, an injunction, actual damages, attorney's fees and costs, and punitive damages.

The parties filed several dispositive motions before trial. These included cross-motions for summary judgment concerning the trespass claim, which required interpretation of the scope of the easement. In granting Bluebonnet's and Petro–Guard's motion for partial summary judgment and denying CenterPoint's and Sprint's motion, the trial court concluded that Center-Point's and Sprint's use of the easement exceeded the scope of the easement as a matter of law and thus constituted a trespass.[3]

At the close of the jury trial, Bluebonnet and Petro–Guard nonsuited their fraud claim, and the trial court directed verdicts on their claims for unjust enrichment, tortious interference, fraudulent concealment, and punitive damages. The jury determined that the discovery rule tolled limitations, and that Bluebonnet and Petro–Guard had incurred damages for lost rents of $64,107.45, from July 22, 1998 to April 12, 2002, and $101,623.27, from April 13, 2002 to the time of trial. The trial court then conducted a bench trial on Bluebonnet's and Petro–Guard's request for injunctive relief and attorney's fees and signed findings of fact and conclusions of law in support of those rulings. The final judgment challenged here (1) enjoined CenterPoint and Sprint from using CenterPoint's easement for wireless communication, (2) required that Sprint remove its equipment from the property, and (3) awarded Bluebonnet and Petro–Guard damages, interest, and costs against both CenterPoint and Sprint and attorney's fees against CenterPoint.

## Whether the Easement Encompasses Use for Cellular Transmission

■ In their first issue, CenterPoint and Sprint challenge the trial court's conclusion that CenterPoint's and Sprint's use of cellular transmission equipment within the easement "exceeds the scope of the easement as a matter of law."[4] They

2. A bank has leased the property since 1991. Bluebonnet and Petro-Guard became the bank's landlords when they purchased the property in 2004.

3. In addition, the trial court denied Center-Point's and Sprint's motion for summary judgment on limitations, their motion to dismiss for lack of subject-matter jurisdiction, and their objections to any references before the jury regarding the trial court's having determined that CenterPoint's and Sprint's use of the easement constituted a trespass.

4. The trial court reached this conclusion in response to the parties' cross-motions for summary judgment, which the trial court resolved by rendering partial summary judgment in favor of Bluebonnet and Petro-Guard. This interlocutory judgment became merged with the final judgment at the close of trial. See Webb v. Jorns, 488 S.W.2d 407, 409 (Tex.1972) (stating that interlocutory judgment becomes final judgment when it merges into final judgment disposing of whole case); see also C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 779 n. 9 (Tex.App.–Houston [1st Dist.] 2004, no pet.) (citing Newco Drilling Co. v. Weyand, 960 S.W.2d 654, 656 (Tex. 1998) (stating general rule that interlocutory summary judgment is final as to issues addressed when rendered and becomes final

argue that the trial court misinterpreted the easement as foreclosing installation of Sprint's wireless communications equipment and therefore erred by concluding that the use constituted a trespass. As in the trial court, CenterPoint and Sprint contend that no trespass occurred, and that they did not exceed the permissible scope of the easement because the easement expressly permits installation of both "electric transmission and distributing lines," and "all necessary and desirable appurtenances ... including ... telephone and telegraph wires."

## A. Easements and Trespass

■■■ "An easement is a non-possessory interest that authorizes its holder to use property for a particular purpose." *Koelsch v. Indus. Gas Supply Corp.* 132 S.W.3d 494, 497 (Tex.App.–Houston [1 Dist.] 2004, pet. denied) (citing *Marcus Cable Assocs. v. Krohn,* 90 S.W.3d 697, 700 (Tex.2002)). A trespasser has neither express nor implied permission to enter the property of another, but enters it nonetheless. *Mellon Mortgage Co. v. Holder,* 5 S.W.3d 654, 671 (Tex.1999); *Koelsch,* 132 S.W.3d at 497. An easement holder who exceeds the rights granted by the owner of the servient estate thus commits a trespass. *Marcus Cable,* 90 S.W.3d at 703 (quoting *McDaniel Bros. v. Wilson,* 70 S.W.2d 618, 621 (Tex.Civ.App.–Beaumont 1934, writ ref'd) ("[E]very unauthorized entry upon land of another is a trespass even if no damage is done or the injury is slight. ....")); *see Koelsch,* 132 S.W.3d at 499 (holding that no trespass occurred because easement permitted construction

and relocation of above-ground block valve assembly). A party claiming trespass must establish that the defendant committed an act that exceeded the bounds of any legal rights the defendant may have possessed. *See Koelsch,* 132 S.W.3d at 497 (citing *Murphy v. Fannin County Elec. Coop.,* 957 S.W.2d 900, 903–04 (Tex.App.–Texarkana 1997, no pet.)).

In this case, the trial court concluded, as a matter of law, that (1) CenterPoint and Sprint exceeded the rights acquired by the 1926 easement by permitting placement of Sprint's cellular telecommunications equipment within the easement and (2) therefore committed a trespass. *See id.*

## B. Assignability of Easement Rights

■ CenterPoint claims its rights in this case pursuant to the express easement conveyed to HL & P in 1926. *See Marcus Cable,* 90 S.W.3d at 700 (citing *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 103 (Tex.1999)). Sprint's rights derive from CenterPoint's rights. An easement holder who is authorized to assign or apportion rights to a third party [5] must conform the rights conveyed to the third party to those originally conveyed. *See id.* (citing *Cantu v. Cent. Power & Light Co.,* 38 S.W.2d 876, 877 (Tex.Civ. App.–San Antonio 1931, writ ref'd)). Accordingly, CenterPoint could not grant Sprint any use that "exceed[ed] the rights expressly conveyed to the original easement holder," here HL & P, and, by succession, CenterPoint. *See id.; see also Carrithers v. Terramar Beach Cmty. Improvement Ass'n, Inc.,* 645 S.W.2d 772, 774

and appealable when merged into final judgment)). CenterPoint and Sprint further preserved the challenge presented in their first issue in their motion for judgment notwithstanding the verdict, in which they claimed that their use of the easement did not exceed its scope, and that no trespass occurred,

which precluded any judgment in favor of Bluebonnet and Petro–Guard. The trial court denied the motion for judgment notwithstanding the verdict.

5. CenterPoint's authority to assign its easement rights was not a contested issue.

(Tex.1983) ("[A]n easement may not create a right or interest in a grantee's favor which the grantor himself did not possess.") (citing *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 202 (Tex.1962)).

## C. Interpretation of Easements

We interpret easements according to basic principles of contract construction and interpretation. *Marcus Cable,* 90 S.W.3d at 700; *DeWitt County Elec. Coop.,* 1 S.W.3d at 100; *Koelsch,* 132 S.W.3d at 497. Courts construe contracts as a matter of law, and we review their rulings de novo. *See J.M Davidson, Inc. v. Webster,* 128 S.W.3d 223, 226, 229 (Tex.2003) (applying rule in arbitration-agreement context) (citing *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983)). The intent of the parties, as expressed in the grant, determines the scope of the interest conveyed. *Marcus Cable,* 90 S.W.3d at 700–01; *Koelsch,* 132 S.W.3d at 497–98. To interpret the parties' intentions adequately and to discern the scope of the rights conveyed to the easement holder, we focus on the terms of the granting language. *See Marcus Cable,* 90 S.W.3d at 701 (citing *DeWitt County Elec. Coop.,* 1 S.W.3d at 103 and *Houston Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 664–65 (Tex.1964)); *Koelsch,* 132 S.W.3d at 497–98; *see also Marcus Cable,* 90 S.W.3d at 701 (citing and quoting RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 (providing that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the cir-

cumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created")).

We rely solely on the written terms of the easement unless the language is ambiguous. *Koelsch,* 132 S.W.3d at 498.[6] When terms are not defined, we give them their "plain, ordinary, and generally accepted meaning." *Marcus Cable,* 90 S.W.3d at 701 (citing *DeWitt County Elec. Coop.,* 1 S.W.3d at 101). Courts must consider the entire writing, assume that the parties intended to give effect to every clause they chose to include, and strive to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs.,* 165 S.W.3d 310, 312 (Tex.1999); *Koelsch,* 132 S.W.3d at 498; *Corley v. Entergy Corp.,* 246 F.Supp.2d 565, 573 (E.D.Tex.2003); *see also Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006) (construing contract for sale of oil and gas working interest and stating that courts must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions ... so that none will be rendered meaningless" and that "[n]o single provision taken alone will be given controlling effect," but that "all the provisions must be considered with reference to the whole instrument").

When interpreting the granting language of an easement, we resolve

---

6. The language of an easement is not ambiguous when the terms can be given a certain or definite meaning, in which case we interpret the easement as a matter of law. *See DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999). Terms are not ambiguous simply because they are not clear or because the parties proffer differing interpretations of them. *Id.* Ambiguity arises only when applying the established rules of construction re-

sults in more than one equally reasonable interpretation. *Id.; see Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex. 2005) (interpreting term equipment-lease agreement with purchase-option provision). In this case, the parties' postures in filing cross-motions for summary judgment as a matter of law belie claims of ambiguity, despite CenterPoint's and Petro–Guard's having asserted ambiguity as an alternative claim.

doubts about the parties' intent against the grantor, or servient, estate and adopt the interpretation that is the least onerous to the grantee, or dominant, estate in order to confer on the grantee the greatest estate permissible under the instrument. *See Houston Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 665 (Tex.1964); *Stevens v. Galveston, H. & S.A. Ry. Co.,* 212 S.W. 639, 644 (Tex.Comm.App.1919); *Gulf View Courts, Inc. v. Galveston County,* 150 S.W.2d 872, 874 (Tex.Civ.App.–Galveston, 1941, writ ref'd).[7]

 No rights pass to the easement holder by implication except those that are "reasonably necessary" to enjoy the rights that the easement grants expressly. *Marcus Cable,* 90 S.W.3d at 701 (citing *Coleman v. Forister,* 514 S.W.2d 899, 903 (Tex. 1974)). Accordingly, if the grant expressed in the easement cannot be construed to apply to a particular purpose, a use for that purpose is not allowed. *See id.* In *Marcus Cable,* the supreme court construed an easement that granted an electrical utility permission to construct and maintain "an electric transmission or distribution line or system" over private real property. *Id.,* 90 S.W.3d at 699. In 1991, Marcus Cable obtained permission from the utility to attach cable lines and wiring to the utility's poles, but its agreement with the utility limited use of the poles to lawful activity by the utility. *Id.* The property owners sued, claiming that the cable company did not have a valid easement and that they had not consented to the placement of the cable lines across their property. *Id.* The supreme court held that the grant expressed in the easement encompassed only an "electric transmission or distribution line or system" and

therefore did not encompass use for cable television transmission. 90 S.W.3d at 706.

Yet, *Marcus Cable* acknowledged that the common law permits some flexibility in determining an easement holder's rights because the manner, frequency, and intensity of use of an easement "may change over time to accommodate technological development." *Id.,* 90 S.W.3d at 701 (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1). Changes must, however, "fall within the purposes for which the easement was created, as determined by the grant's terms." *See id.* (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 1.2 cmt. d ("The holder of the easement . . . is entitled to make only the uses reasonably necessary for the specified purpose."); 4.10 & cmt. a (noting that manner, frequency, and intensity of easement may change to take advantage of technological advances, but only for purposes for which easement was created)). Accordingly, an express easement "encompasses only those technological developments for which the easement was granted." *Id.,* 90 S.W.3d at 702 (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 1.2 cmt. d, cmt. a, 4.10 & cmt. a).

In *Marcus Cable,* the supreme court construed the utility easement as limited to the purpose of conveying electricity by demonstrating that settled law had interpreted the terms "electric transmission" and "electric distribution" as referring exclusively to conveyances of electricity. *Id.,* 90 S.W.3d at 703–04. Accordingly, the court declined to permit a use by Marcus

---

7. This rule applies when the language used to accord rights is doubtful or less than clear; the rule does not apply when an instrument is subject to more than one reasonable interpretation and is, therefore, ambiguous, in which case the instrument is construed against its author. *See Houston Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 665 (Tex.1964). There is no claim of ambiguity here, and the latter rule does not apply.

Cable that went beyond conveying electricity. *Id.*, 90 S.W.3d at 704.

We distinguish *Marcus Cable*, however, because there was never an argument in that case that the express grant to the utility—to construct and maintain an "electric transmission or distribution line or system"—was broad enough to encompass use for cable-television transmission. *See id.*, 90 S.W.3d at 704. To the contrary, the cable company maintained that it should be *permitted* to use the utility's poles, despite the narrow language of the easement, for the following reasons: (1) easements should be construed to encompass technical advances, (2) public policy favored expansion of cable-television services, and (3) adding cable-television wires to existing poles did not increase the burden on the property owners (the servient estate). *See id.*

## D. Discussion

### 1. The Plain Terms of the Easement

■ In contrast to the cable company's position in *Marcus Cable*, which would have required that the limited purpose stated in the express easement be impermissibly expanded, *see id.*, CenterPoint and Sprint contend, and we agree, that the plain terms of the express easement here are amply sufficient to encompass use of CenterPoint's easement for Sprint's cellular transmission lines and equipment.

The express easement conveyed to CenterPoint, as HL & P successor, grants a right-of-way not only for "electric transmission and distributing lines consisting of variable numbers of wires," but also for "all necessary and desirable appurtenances." The easement then specifies that "necessary and desirable appurtenances" includes "towers or poles made of wood, metal or other materials, telephone and telegraph wires, props and guys."

The plain meaning of these terms conveys the right to install "appurtenances" as "additions" or "attachments" when "necessary and desirable." *See Univ. of Tex. Med. Branch v. Davidson*, 882 S.W.2d 83, 86 (Tex.App.–Houston [14th Dist.] 1994, no writ) (interpreting "appurtenance" as "addition" "attached" to something else). The plain meaning of these terms further specifies that "telephone and telegraph wires" are among the appurtenances that may be installed when necessary and desirable. That the easement expressly retains other utility rights—"water, gas, sewerage, and the like"—but is silent regarding telephone rights reinforces our interpretation. *See Frost Nat'l Bank*, 165 S.W.3d at 312; *Koelsch*, 132 S.W.3d at 498; *Corley*, 246 F.Supp.2d at 573 (emphasizing that all terms of instrument must be considered).

Bluebonnet and Petro–Guard dispute this interpretation and contend, as in the trial court, that the easement permits telephone and telegraph wires only as "necessary and desirable" for CenterPoint's internal communications utilized to control the flow of electricity. We agree with CenterPoint and Petro–Guard that the language and terms of the easement do not support this restrictive interpretation.

■ In interpreting the permission conveyed by an easement, we consider the terms used, and all of the terms used, in order to give effect to all provisions. *See Marcus Cable*, 90 S.W.3d at 701, *DeWitt County Elec. Coop.*, 1 S.W.3d at 103, *Koelsch*, 132 S.W.3d at 498; *Corley*, 246 F.Supp.2d at 573. But we rely solely on those terms except in the case of ambiguity, *Koelsch*, 132 S.W.3d at 498, which is not an issue here. We may not, therefore, add terms not present in the easement, as Bluebonnet's and Petro–Guard's conten-

tion would require.[8] *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 161–63 (Tex.2003) (stating, in context of insurance-coverage determination, "we may neither rewrite the parties' contract nor add to its language"); *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 640–42 (Tex.App.–Houston [14th Dist.] 2005, no pet.) (declining to "rewrite" drilling contract or "add to it under the guise of interpretation"); *see also Oxford v. Williams Cos.*, 154 F.Supp.2d 942, 949–50 (E.D.Tex.2001) (memo op.) (holding that language of easement did not support restrictive interpretation proposed by landowner owners of servient estate).

## 2. Technological Advancement or Development

CenterPoint and Sprint acknowledge that the terms of the easement address only "telephone and telegraph wires," in keeping with the known technology of 1926, and thus do not expressly convey rights to wireless telephone transmission and equipment as appurtenances that are "necessary and desirable." They contend, however, that in *Marcus Cable*, the supreme court recognized the technological advancement doctrine and that the doctrine applies to permit the installations permitted by CenterPoint's agreement with Sprint. We agree.

 The common law recognizes that the "manner, frequency, and intensity of an easement's use may change over time to accommodate technological advances" and thus permits "some flexibility in determining an easement holder's rights," as long as the changes respect the original purpose stated in the terms of the grant. *Marcus Cable*, 90 S.W.3d at 701–02 (citing

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 4.10 & cmt. a, 1.2 cmt. d.). The doctrine did not apply in *Marcus Cable* because the express easement at issue in that case could not be construed as permitting any purpose beyond electrical transmission. 90 S.W.3d at 702–03.

 In this case, however, the plain terms of CenterPoint's express easement reflect not only electrical transmission as a purpose of the easement, but also telephone and telegraph transmission as a purpose of the easement. An express easement properly encompasses technological developments that "further the particular purpose for which the easement is granted." *Id.* (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 1.2 cmt. d, cmt. a, 4.10 & cmt. a). Citing the Restatement, *Marcus Cable* expressly recognized, as an example of appropriate application of the doctrine of technological advancement or development, that a holder of an easement granted in 1940 for the purpose of telephone transmission could properly attach transmitters to its poles for cellular telephone transmissions unless that use would interfere unreasonably with the servient estate. *See id.*, 90 S.W.3d at 702 (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 illus. 13); *see also Corley*, 246 F.Supp.2d at 578–79 (holding that easements using terms "telephone," "telegraph," and "communications" could properly be utilized for both internal communications and for third-party voice and data communications).

We hold that the express terms of the CenterPoint easement encompass installation and use of cellular transmission within the easement, and that CenterPoint did

---

8. In *Corley v. Entergy Corp.*, 246 F.Supp.2d 565 (E.D.Tex.2003), the federal district court construed an easement as expressly restricted to electrical transmissions and internal communications, but based its holding on the plain language of the easement, which stated that restriction. 246 F.Supp.2d at 577–78.

not exceed the scope of the easement in assigning those rights to Sprint. Accordingly, the trial court erred by concluding that CenterPoint and Sprint had exceeded the scope of the easement.

We sustain CenterPoint's and Sprint's first issue. Because this disposition compels that we reverse and render judgment that Bluebonnet and Petro–Guard take nothing on their claims against Center-Point and Sprint, we need not address their remaining issues.

## Conclusion

We reverse the judgment of the trial court and render a take-nothing judgment against Bluebonnet and Petro–Guard.