# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00797-CV

**Appellant, Pedernales Electric Cooperative, Inc.// Cross-Appellants, Samuel S. White, Janette Barlow, Gregory Colon and Stephanie Colon**

**v.**

**Appellees, Samuel S. White, Janette Barlow, Gregory Colon and Stephanie Colon//Cross-Appellee, Pedernales Electric Cooperative, Inc.**

### FROM THE COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY
### NO. 19-1250-C, THE HONORABLE ROBERT UPDEGROVE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this case involving an easement for an electric transmission line, appellant Pedernales Electric Cooperative, Inc. (PEC) and cross-appellants Samuel S. White, Janette Barlow, Gregory Colon and Stephanie Colon (the Landowners) appeal the trial court's final judgment issuing a permanent injunction prohibiting PEC from operating the electric transmission line at an increased voltage and awarding damages and attorney's fees to the Landowners for breach of the easement. In five issues on appeal, PEC contends that the trial court erred in: (1) interpreting the easement to disallow PEC from increasing the voltage of the line; (2) issuing a permanent injunction against PEC to prevent it from operating the line at an increased voltage; (3) awarding damages to the Landowners for breach of the easement; (4) awarding an amount of damages to the Landowners that was not supported by the evidence; and (5) awarding attorney's fees to the Landowners. In a single issue on cross-appeal, the

Landowners assert that the trial court erred in not disallowing PEC from engaging in other actions associated with the increased voltage, such as building taller poles made of steel. Because we agree with PEC that the increased voltage and PEC's other challenged actions associated with the increase did not violate the terms of the easement, we will reverse the trial court's judgment and render judgment that Landowners take nothing on their claims.

## BACKGROUND

In 1968, the Landowners' predecessors in title, J.B. and Katherine Winn, conveyed to PEC an "easement and right of way" (the Winn Easement) "for an electric transmission and/or distribution line, consisting of variable number of wires, and all necessary or desirable appurtenances (including towers, H-frames or poles made of wood, metal or other materials, telephone and telegraph wire, props and guys), over, across and upon" a sixty-foot-wide strip of land, described by metes and bounds, running across the Landowners' properties in Hays County near Wimberley. The Winn Easement also granted to PEC:

> the right of ingress and egress over [the] adjacent lands to or from said right of way for the purpose of constructing, reconstructing, inspecting, patrolling, hanging new wire on, maintaining and removing said lines and appurtenances; the right to relocate within the limits of said right of way; the right to remove from said lands all trees and parts thereof, or other obstructions, which endanger or may interfere with the efficiency of said lines or their appurtenances.

PEC subsequently constructed a four-mile, high-voltage, 69-kilovolt transmission line on wooden poles that ran across numerous properties, including those belonging to the Landowners. Today, this transmission line is the primary source of electricity for the Wimberley area.

Over time, Wimberley's increasing demand for electricity significantly increased the peak load requirements for PEC's transmission system. In 2017, to meet the increased

demand, PEC sought approval from the Public Utility Commission (PUC) to upgrade its transmission line, including the portion that runs across the Landowners' properties, from a 69-kilovolt line to a 138-kilovolt line. The upgrade project, which PUC approved in 2019, included taller poles made of steel and larger electricity conductors. In its order approving the project, PUC found that the Wimberley area had experienced "significant growth over the last several years," that "PEC's existing facilities are insufficient to meet the anticipated future growth of the area," and that the upgrade would "provide the necessary infrastructure capacity to support the growing loads in Wimberley, provide needed capacity for backup to feeders at adjacent substations," and decrease the risk of long-term power outages. PUC also found that the "visual feature" of the upgraded line "will not be a feature that is inconsistent with existing features in the area" because "the project is primarily being built within the exact same corridor as the existing 69-kV transmission line that is being built and upgraded," and "[f]rom an aesthetics perspective, the project will not present a view dissimilar to other linear rights-of-way throughout the area following completion of construction and restoration activities."

In late 2019, PEC began installing new steel poles on the Landowners' properties near the location of the original wooden poles. The number of poles did not change; both the original and upgraded lines had four poles spread across the three subject properties. However, the new poles were taller; the old poles were approximately 48 feet tall while the new poles were between 67 and 72 feet tall. Shortly after constructing the poles, PEC hung new wire on the poles and energized the line, increasing the voltage from 69 to 138 kilovolts.

In September 2019, at around the same time that PEC had begun installing the new poles, the Landowners filed suit against PEC, asserting claims for breach of contract, trespass, and "impermissible additional servitude." Specifically, the Landowners alleged that the

3

Winn Easement did not convey to PEC the right to upgrade the line, that PEC's access to their properties as part of its upgrade project constituted a trespass, that "[t]he voluntary and intentional actions of PEC constitute an impermissible additional servitude across the Plaintiffs' properties," and that PEC "has acted beyond the scope of the Winn Easement by accessing Plaintiffs' properties as part of the 'upgrade' project," thereby breaching the easement.

In their petition, the Landowners sought temporary and permanent injunctive relief, and in November 2019, the trial court held a hearing on their request for a temporary injunction. At the conclusion of the hearing, the trial court took the matter under advisement and suggested that the parties proceed to mediation, which they did. In January 2021, after mediation had failed, the trial court granted the Landowners a temporary injunction, prohibiting PEC from: (1) continuing work on the capacity-upgrade project on the Landowners' properties, (2) operating the transmission line at its upgraded capacity, and (3) accessing the Landowners' properties for maintenance or operations in connection with the capacity-upgrade project.[1] PEC filed an appeal of the temporary injunction and a motion for emergency relief, seeking the issuance of a supersedeas bond. This Court remanded the case to the trial court for the entry of an order requiring PEC to post a supersedeas bond and stayed the temporary injunction. *See Pedernales Elec. Coop., Inc. v. White*, No. 03-21-00034-CV, 2021 WL 401982, at *3 (Tex. App.—Austin Feb. 4, 2021) (per curiam) (order and mem. op.).

The case continued in the court below. The parties filed cross-motions for summary judgment on liability, advancing conflicting interpretations of the easement. The Landowners argued that the easement prohibited upgrading the transmission line and all actions

---

[1] The trial court found that work on the project was ongoing at the time of the temporary-injunction hearing and that even when the work was complete, PEC would likely continue to access the properties for operation and maintenance purposes.

4

associated with upgrading the line, including increasing the voltage of the line and changing the material, height, and configuration of the poles. PEC argued that the easement allowed the upgrade. Following a hearing, the trial court granted the Landowners' summary-judgment motion in part, ruling that PEC "exceeded the permissible scope of the subject easement agreement by increasing the voltage of the subject electric transmission line" and therefore was liable for both breach of contract and trespass.[2] The court denied the remainder of the Landowners' summary-judgment motion, including its contention that PEC further exceeded the scope of the easement by changing the poles. The trial court also denied PEC's motion for summary judgment.

Following a bench trial on damages for breach of the easement, the trial court awarded Jeanette Barlow damages of $37,884, Samuel White damages of $66,528, and Stephanie and Gregory Colon damages of $145,530. The court further awarded the Landowners $159,255 in attorney's fees for trial work, contingent appellate fees of $50,000 if PEC is unsuccessful in this Court, and $40,000 if PEC is unsuccessful in the Texas Supreme Court. The trial court also issued a permanent injunction prohibiting PEC from operating the transmission line at the higher voltage level but suspended the injunction until 75 days after "the exhaustion of any and all appeals, if any." This appeal by both PEC and the Landowners followed.

**STANDARD OF REVIEW**

This appeal turns on the interpretation of the Winn Easement, which was decided on summary judgment in the court below. We review a trial court's ruling on summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To

---

[2] Prior to the issuance of summary judgment, the Landowners nonsuited their claim for "impermissible additional servitude."

prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When cross-motions for summary judgment are filed, "[e]ach party bears the burden of establishing that it is entitled to judgment as a matter of law." *Guynes v. Galveston Cnty.*, 861 S.W.2d 861, 862 (Tex. 1993). When the facts are undisputed and the trial court grants one motion and denies the other, as here, "we consider the summary-judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Southwestern Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015); *Texas Tel. Ass'n v. Public Util. Comm'n of Tex.*, 653 S.W.3d 227, 245 (Tex. App.—Austin 2022, no pet.); *see Guynes*, 861 S.W.2d at 862.

## DISCUSSION

In PEC's first issue, PEC contends that the trial court erred in interpreting the easement to disallow PEC from increasing the voltage of the line. In the Landowners' sole issue on cross-appeal, they assert that the trial court erred in interpreting the easement to allow PEC to engage in other actions associated with the increased voltage. We will address these issues together.

"An easement is a non-possessory property interest that authorizes its holder to use the property of another for a particular purpose." *Severance v. Patterson*, 370 S.W.3d 705, 736 (Tex. 2012); *see Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). "A grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974). "However, the burden

6

on the servient estate is secondary to ensuring that the purpose of the easement is reasonably fulfilled." *Id.* Use of the easement to pursue a purpose not provided for in the grant is not permitted. *Marcus Cable*, 90 S.W.3d at 701; *Coleman*, 514 S.W.2d at 903.

An easement's express terms, interpreted according to their generally accepted meaning, delineate the purposes for which the easement holder may use the property. *Marcus Cable*, 90 S.W.3d at 701. "We apply basic principles of contract construction and interpretation when considering an express easement's terms." *Id.* (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)); *see Davis v. Johnston*, No. 03-10-00712-CV, 2012 WL 2499472, at *15–17 (Tex. App.—Austin June 28, 2012, no pet.) (mem. op.) (applying basic principles of contract construction and interpretation to determine express easement's meaning and scope). The "starting point" is "the easement's plain language." *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 689 (Tex. 2020) (citing *Marcus Cable*, 90 S.W.3d at 700). "The contracting parties' intentions, as expressed in the grant, determine the scope of the conveyed interest." *Marcus Cable*, 90 S.W.3d at 700–01 (citing *DeWitt Cnty. Elec. Coop.*, 1 S.W.3d at 103). "When the grant's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning." *Id.* at 701 (citing *DeWitt Cnty. Elec. Coop.*, 1 S.W.3d at 101).

"When interpreting the granting language of an easement, we resolve doubts about the parties' intent against the grantor, or servient, estate and adopt the interpretation that is the least onerous to the grantee, or dominant, estate in order to confer on the grantee the greatest estate permissible under the instrument." *CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd.*, 264 S.W.3d 381, 388–89 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). "No rights pass to the easement holder by implication except those that are 'reasonably necessary' to

enjoy the rights that the easement grants expressly." *Id.* at 389. However, "[t]he common law does allow some flexibility in determining an easement holder's rights." *Marcus Cable*, 90 S.W.3d at 701. "In particular, the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development." *Id*. "But such changes must fall within the purposes for which the easement was created, as determined by the grant's terms." *Id*. Thus, "an express easement encompasses only those technological developments that further the particular purpose for which the easement was granted." *Id*.

The question in this case is whether the scope of the Winn Easement encompasses PEC's replacement and relocation of the existing transmission line with a higher-voltage line supported on taller poles made of steel. The Landowners argue that it does not, focusing on the absence of terms in the easement such as "upgrade," "enhance," "improve," "modernize," "increase," "make additions to" and "modify."

As support for their contention that the upgrade was not allowed, the Landowners rely on *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662 (Tex. 1964). In that case involving a gas-pipeline easement, the landowners conveyed to the pipeline company "a right of way to lay, maintain, operate, repair and remove a Pipe Line for the transportation of gas" but struck out the words "and remove" from the granting clause and deleted language giving the company the right to construct additional pipelines. *Id*. at 663. The agreement contained no specifications for the size of the pipeline, did not prescribe metes and bounds for the easement, and did not define a course or direction for the pipe to follow across the land. *Id*. The original pipeline, laid in 1926, was 18 inches in diameter. Over three decades later, the pipeline company "removed the old 18-inch line which it had originally laid, reditched the property and installed a 30-inch pipe along the same course." *Id*. The landowners argued that this was impermissible for two reasons. First,

8

they argued that the agreement did not expressly authorize the replacement or removal of the existing pipeline except upon termination of the agreement. The *Dwyer* court disagreed, holding that "the terms 'operate' and 'maintain' in the granting clause are at least broad enough to include the right to remove and replace the original pipe with pipe of the same size when necessary." *Id*. at 664.

The landowners next argued that the easement did not permit the pipeline company to construct, maintain, and operate the new 30-inch pipeline, and the *Dwyer* court agreed with this contention. The court held that "when defendant constructed its 18-inch pipeline with the consent and acquiescence of the plaintiff, the extent of defendant's easement rights under the 1926 agreement became fixed and certain." *Id*. at 666. Consequently, the easement did not authorize the company "to remove this 18-inch line initially constructed and replace it with a line of substantially greater size." *Id*. The Landowners argue that a similar rule should apply in this case and that PEC should not be permitted to upgrade its transmission line.

The Landowners' reliance on *Dwyer* is misplaced for at least two reasons. First, unlike the Winn Easement, the easement agreement in *Dwyer* contained no physical boundaries, which the *Dwyer* court concluded could result in enlargement of the easement each time the pipe was rebuilt, contrary to the parties' intent. As the court explained, "Although there is no limitation on the size of the pipe to be laid, it does not necessarily follow that the parties, for a consideration of $32.00, intended to burden their land with an easement which might be enlarged over and over again, as often as an increase in demands for gas might make it necessary." *Id*. at 665–66. To avoid such a result, the *Dwyer* court, relying on a rule of property law for making "general and indefinite" easements "fixed and certain," limited the easement in that case to the location where the company originally laid the pipe and prevented the company from

9

substantially increasing the size of the pipe at that location moving forward. *Id.* at 666. The Winn Easement here, in contrast, has physical boundaries and is already limited by its express terms to a sixty-foot strip of land defined in the agreement by metes and bounds, and it is undisputed that PEC's upgrade occurred entirely within those stated boundaries. Thus, the limitation placed on the easement in *Dwyer* is inapplicable here.

Additionally, the easement in *Dwyer* was limited to "lay[ing], maintain[ing], operat[ing], and repair[ing] a pipeline," without reference to any future additions, variations, or appurtenances to the line. *See id*. at 664. In contrast, the Winn Easement conveyed to PEC an easement and right of way for "an electric transmission and/or distribution line, consisting of variable number of wires, and all necessary or desirable appurtenances (including towers, H-frames or poles made of wood, metal or other materials, telephone and telegraph wire, props and guys), over, across and upon" a sixty-foot-wide strip of land running across the Landowners' properties. The Winn Easement further granted to PEC "the right of ingress and egress over" the Landowners' properties "to or from said right of way for the purpose of constructing, reconstructing, inspecting, patrolling, hanging new wire on, maintaining and removing said lines and appurtenances; the right to relocate within the limits of said right of way; the right to remove from said lands all trees and parts thereof, or other obstructions, which endanger or may interfere with the efficiency of said lines or their appurtenances."

By its terms, the Winn easement is broad and expansive. Because the terms are not defined in the easement, we give them their plain, ordinary, and generally accepted meaning. *See Marcus Cable*, 90 S.W.3d at 701. The easement provides that the transmission line may consist of a "variable" number of wires and "all necessary or desirable appurtenances." "Variable" means "able or apt to vary or change" and "changeable, shifting." *See Variable*,

10

Webster's Third New Int'l Dictionary 2533 (2002). "Appurtenances" are "accessory objects used in any function." *See Appurtenances*, Webster's Third New Int'l Dictionary 107 (2002). With respect to real property, they include "'everything necessary to the beneficial use of the property, . . . whatever is needed to complete a structure and make it capable of performing its intended function.'" *Pine v. Gibraltar Sav. Ass'n*, 519 S.W.2d 238, 241 (Tex. Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.) (quoting 6 C.J.S. Appurtenance 136). Appurtenances are "analogous to 'improvements.'" *Hancox v. Peek*, 355 S.W.2d 568, 569 (Tex. Civ. App.—Fort Worth 1962, writ ref'd n.r.e.); *see also CenterPoint Energy Houston Elec. LLC*, 264 S.W.3d at 390 (defining "appurtenances" as "additions" or "attachments" to property). The Winn Easement expressly provides that "all necessary or desirable appurtenances" includes "poles made of wood, metal, or other materials." The easement provides no restriction on the height of the poles, their location within the right of way, or the materials of which they may be made.

The easement further grants to PEC expansive rights to "reconstruct," "hang new wire on," "maintain" and "relocate" the line. "Reconstruct" means to "construct again" and "rebuild." *See Reconstruct*, Webster's Third New Int'l Dictionary 1897 (2002). "Maintain" means "to keep in a state of repair, efficiency, or validity," and "to preserve from failure or decline." *See Maintain*, Webster's Third New Int'l Dictionary 1362 (2002). "Relocate" means to "establish or lay out in a new place." *See Relocate*, Webster's Third New Int'l Dictionary 1919 (2002). Thus, by these terms, the easement expressly conveyed to PEC the right to rebuild the line, maintain the line's ability to transmit electricity, hang new wire on the line for that purpose, and move the line to a new location within the right of way. Texas courts, including the Texas Supreme Court and this Court, have construed similar easement language to allow for similar projects upgrading transmission and gas lines. *See, e.g.*, *Southwestern Elec. Power Co.*

11

*v. Lynch*, 595 S.W.3d 678, 690–91 (Tex. 2020) (concluding that easement was not limited to thirty-foot width previously utilized by electric company); *Johnson v. Southwestern Pub. Serv. Co.*, 688 S.W.2d 653, 655 (Tex. App.—Amarillo 1985, no writ) (concluding that easement authorized electric company to remove old line and replace it with new, higher-capacity line); *Lower Colorado River Auth. v. Ashby*, 530 S.W.2d 628, 632 (Tex. App.—Austin 1975, writ ref'd n.r.e.) (concluding that electric company's right to maintain transmission line "would include the right to completely remove and rebuild the transmission line in whatever manner and form authorized by the easement"); *Central Power & Light Co. v. Holloway*, 431 S.W.2d 436, 439-40 (Tex. App.—Corpus Christi–Edinburg 1968, no writ) (concluding that because electric company "was expressly given the right to reconstruct its transmission line and to relocate it," it would be unreasonable to "require the company to re-install its electric line at the exact same elevation where it was first placed"); *Knox v. Pioneer Nat. Gas Co.*, 321 S.W.2d 596, 601 (Tex. App.—El Paso 1959, writ ref'd n.r.e.) (concluding that "the removal of the original pipe line and the replacement of same by the new 12-inch line in the same ditch, using no more land than was reasonably necessary in the performance of such work" did not violate terms of easement). Following these and other cases, we conclude that the easement permitted PEC to upgrade its transmission line in the manner that it did, including by increasing the voltage and changing the height, location, and material composition of the poles.

The Landowners place significance on the fact that the Winn Easement does not expressly provide for an increase in the line's voltage. However, neither does the easement restrict the amount of voltage that may run through the line, and we conclude that the lack of such a restriction is dispositive here. "Parties that enter into easements are certainly capable of writing" restrictions into an easement, but "sometimes parties to an easement account for

12

anticipated developments in technology and demand by not" including certain restrictions in an easement. *Lynch*, 595 S.W.3d at 690. "[E]xpress easements by conveyance are, by their very nature, forward-looking," and "when easements are negotiated between two parties, it is 'assumed that the parties contemplated changes in the use of the servient tenement by the normal development in the use of the dominant tenement.'" *Id.* at 688 (quoting *Knox*, 321 S.W.2d at 601). As another court observed, "[E]very easement carries with it the right to do whatever is reasonably necessary for the full enjoyment of the easement itself." *Johnson*, 688 S.W.2d at 655. "The creation of an easement contemplates, unless negated by specific language, a future use consistent with the grant by the one entitled to it, under conditions different from those existing at the time of the conveyance, so that the easement owner may enjoy or carry out the object for which the easement was granted." *Id.*

We agree with PEC that "[t]he Winn Easement's purpose was to allow electrical transmission and distribution lines to cross the Landowners' properties," that this purpose "necessarily contemplated PEC's upgrade of its transmission line to meet increased demand or technological changes," and that PEC's "rebuild project directly serves the easement's purpose by installing a new line using current technology to respond to the area's increased power needs." Moreover, the increase in voltage, although not expressly provided for in the easement, is "reasonably necessary" to enjoy the rights that the easement grants expressly. As the PUC found when approving the project, the Wimberley area had experienced "significant growth over the last several years," "PEC's existing facilities are insufficient to meet the anticipated future growth of the area," and the upgrade would "provide the necessary infrastructure capacity to support the growing loads in Wimberley, provide needed capacity for backup to feeders at adjacent substations," and decrease the risk of long-term power outages.

13

For these reasons, we conclude that the trial court erred in granting partial summary judgment to the Landowners on the basis that the new line could not have greater voltage than the original line but did not err in denying the remainder of the Landowners' motion. The trial court should have denied the Landowners' motion in its entirety and granted PEC's motion for summary judgment because, as a matter of law, PEC did not breach the easement agreement or commit trespass when it upgraded its transmission line.

We sustain PEC's first issue and overrule the Landowners' sole issue on cross-appeal. We need not consider the other issues raised by PEC. *See* Tex. R. App. P. 47.1.

## CONCLUSION

Absent PEC's liability for breach of contract or trespass, the trial court had no basis to award the Landowners a permanent injunction, damages, or attorney's fees. Accordingly, we reverse the trial court's judgment, vacate the permanent injunction against PEC, and render judgment that the Landowners take nothing on their claims against PEC.

_____
Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Reversed and Rendered

Filed: December 11, 2024